ASPDEN AND OTHERS COMPLAINANTS, v. NIXON AND OTHERS, DEFEND-
ANTS.

Where a person domiciled in England died, leaving property both in England and
Pennsylvania, and the executor took out letters testamentary in both countries,
in a suit in England against the executor by the administrator of a deceased
claimant, the parties were restricted to the limits of the country to which their
letters extended.

The executor could not rightfully transmit the Pennsylvania assets to be distributed
by a foreign jurisdiction.

So, the administrator of the deceased claimant, acting under letters granted in Eng-
land, only represented the intestate to the extent of these English letters, and
could not be known as a representative in Pennsylvania.

Two suits, therefore, one in England, between the executor and the administrator
of a deceased claimant, acting under English letters, and the other in Pennsyl-
vania, between the executor and another administrator of the claimant, acting
under Pennsylvania letters, are suits between different parties. And neither
the decree nor proceedings in the English suit are competent evidence in the
American suit. The property in controversy is different in the two suits.

A judgment or decree set up as a bar by plea, or relied on as evidence by way of
estoppel, to be conclusive, must have been made, —

1. By a court of competent jurisdiction, upon the same subject-matter.

2. Between the same parties.

3. For the same purpose.

On either ground, the evidence in the English suit is incompetent to prove any
thing with regard to the Pennsylvania assets.

Although, in cases peculiarly circumstanced, one jurisdiction administering assets
may, as matter of comity, transmit them to a foreign jurisdiction, yet they cannot
be sent to England where a suit is pending in this country for the American as-
sets. A decree of the High Court of Chancery in England, purporting to dis-
tribute assets so situated, would be treated as void for want of jurisdiction.

The Circuit Court of the United States, sitting in Pennsylvania, is bound by the
same rules which govern the local tribunals of that State, and would require a
devisee to give security to refund in case a debt should afterwards be proved
against the testator. Other provisions of the laws o. that State would also em-
barrass a court in exercising the comity referred to.

Under the influence of similar laws, the courts of the several States have been so
much restrained as to render the exercise of comity among each other little
more than a barren theory. More could not be required between the courts of
this country and England.

There having been no evidence introduced in the English suit to establish the heir-
ship of the claimant, the decision of the court there, dismissing the bill, is not
conclusive as to the title. What effect those proceedings ought to have in this
country, this court will not now decide. It only decides, that the evidence in
support of the title is not barred in the Circuit Court of Pennsylvania.

The judgment of a foreign court upon a question of title cannot preclude a claim-
ant from introducing evidence in a second suit, in another country, for other
property. Such a proposition is not recognized either by the jurisprudence of the
United States or of Great Britain; nor is the opinion of this court in conflict
with the established comity of nations.

THIS case came up, by appeal, from the Circuit Court of the
United States for the District of East Pennsylvania, sitting as a
court of equity.

The circumstances of the case are set forth in the following
statement, which the reporter finds prefixed to the opinion of the
court, and which supersedes the necessity of any statement of his
own.

In 1791, Matthias Aspden, a subject of the king of Great

Britain, and domiciled there, being in the State of Pennsylvania, where he had formerly resided, made his will, whereby he devised his property to his heir at law, with the exception of some trifling specific bequests. He died in England, in 1824 (which country continued to be his place of domicile), leaving much property there, and also much in Pennsylvania. The only surviving executor named in Matthias Aspden's will was Henry Nixon, of Philadelphia, who proved the will, and took out letters testamentary in the Orphan's Court of Philadelphia county, in November, 1824; and he did the same in the proper court in England, in 1825.

The testator left no children, and different persons claimed to be the true devisee, within the description of " heir at law."

In 1828, Samuel Packer filed his bill against the executor Nixon, in the Circuit Court of the United States for the Eastern District of Pennsylvania, alleging that he, Packer, was the devisee, and praying the estate might be distributed to him.

Under this bill, numerous complainants came in by petition, representing themselves to be the next of kin and the true devisees in Pennsylvania, and claiming parts of the estate ; and in December, 1831, John Aspden, of the county of Lancashire, England, was admitted to come in as co-complainant, he claiming to be the rightful heir at law and devisee of Matthias Aspden.

In favor of this, latter claimant a decree was made in 1833, and the bill ordered to be dismissed as to all other claimants. A portion of the latter appealed to this court.

In 1834, Janet Jones, Thomas Poole, and Mary, his wife, moved to file a supplemental bill and bill of review in the Circuit Court ; the said Janet, and Mary claiming to be heirs at law of John Aspden, of London, who was the heir of Matthias Aspden, at the time of Matthias's death, as they alleged. This motion was overruled; as coming too late. Thus stood the proceeding in the Supreme Court on the appeal taken in 1833.

At the January term, 1835, when the cause came on for argument upon the merits, a question was presented by the counsel for the appellants, whether the bill taken by itself, or in connection with the answer, contained sufficient matter upon which the court could proceed, and finally dispose of the cause. It was submitted, that the bill contains no averment of the actual domicile of the testator, at the time he made his will, or at any intermediate period before or at his death. The court directed this question to be argued before the argument should proceed on the merits.

The court, in their decision of this preliminary question, say, that an averment of the testator's domicile is indispensable in the bill, and that the case ought to be remanded to the Circuit Court, for the purpose of having suitable amendments made in this particular. And the court, on the question of the motion to permit the

petitioners for a review, to be heard before the Supreme Court, make the following remarks : —

" It appears from the motions which have been made to this court, as well as from certain proceedings in the court below, which have been laid before us in support thereof, that there are certain claimants of this bequest, asserting themselves to be heirs at law, whose claims have not been adjudicated upon in the court below, on account of their having been presented at too late a period. As the cause is to go back again for further proceedings, and must be again opened there for new allegations and proofs, these claimants will have a full opportunity of presenting and proving their claims in the cause ; and we are of opinion, that they ought to be let into the cause for this purpose. In drawing up the decree, remanding the cause, leave will be given to them accordingly. The decree of the Circuit Court is therefore reversed ; and the cause is remanded to the Circuit Court for further proceedings, in conformity to this opinion." 9 Peters, 505.

On the mandate going down, in June, 1835, John Aspden of Lancashire filed his amended bill, stating the domicile, &c., and John A. Brown, administrator of John Aspden of London, together with Janet Jones and Mary Pool (then widows), the daughters of John of London, were let in to file their petition, claiming the estate of Matthias Aspden on the ground that John of London was the heir.

To this petition Nixon pleaded, that John of London, in 1825, had filed his bill against him, Nixon, as executor, &c., in the High Court of Chancery in England, for an account and distribution of the estate ; which bill had been answered, and the answer replied to. That John of London died in 1828, intestate, his domicile being in England at the time ; and that Thomas Poole, in right of his wife Mary, and Janet Jones, administered on said John's estate in England ; that they, as such administrator and administratrix, proceeded to revive the suit in chancery against the defendant, Nixon ; which was brought to a hearing in the High Court of Chancery, in 1830, and was heard, and the bill dismissed.

And that, afterwards, another bill was brought by said Thomas Poole and Janet Jones, as administrator and administratrix of John Aspden, against said Nixon, as executor of Matthias Aspden, for the same precise subject-matter, in the Court of Exchequer in England ; to which the decree in the High Court of Chancery was pleaded in bar ; and which plea in bar was sustained, and the latter suit dismissed by the Court of Exchequer ; and on these proceedings the defendant Nixon relied as a bar to any further proceedings on the part of the personal representatives of John Aspden of London. The court permitted the latter to reply to the plea of Nixon. The replication alleges, that the bill in the High Court of Chancery in England was dismissed " for want of prosecution," because the claimants were too poor to prosecute the same, or to

Aspden et al. *v.* Nixon et al.

procure their evidence of title ; and that the bill in the Exchequer was dismissed as stated in the plea.

A commission was awarded by order of the court, and evidence taken in England to establish the facts alleged by the replication. From this, it appears that the bills were filed, and the proceedings had, which are set forth by Nixon's plea ; and also that the representatives of John Aspden of London failed to produce any evidence of their title by reason of their poverty. And on the " effect " of this evidence to support the plea in bar, the judges were divided in opinion.

The cause was argued by *Mr. J. Hoffman* and *Mr. David Hoffman*, with whom was *Mr. Charles J. Ingersoll*, for John Aspden of Lancashire, in support of the plea in bar, and by *Mr. Reed* and *Mr. Williams*, for Mrs. Poole and Mrs. Jones, and for John A. Brown, administrator of John Aspden of London, against the validity of the plea.

The question upon which the judges of the Circuit Court were divided in opinion, as certified by the record, was this: — " Is the evidence, touching the plea in bar, sufficient to support it ? "

But after the argument was opened, the counsel were directed by the court to extend their inquiry, and examine the validity of the plea itself. As the decision of the court was, that the plea was insufficient, all the arguments of the counsel either for or against the competency of the evidence to support the plea are omitted.

*Mr. J. Hoffman*, in support of the plea.

There is no principle better settled, than that the decree, sentence, or judgment of any court, having jurisdiction of the subject-matter, whether foreign or domestic, is conclusive upon the rights of the parties in a subsequent proceeding between the same parties or their representatives. Bowles *v.* Orr, 1 Younge & Collyer, 464 ; Martin *v.* Nicolls, 3 Simons, 485 ; 5 Cond. Eng. Ch. Rep. 198 ; 8 Peters, 308 ; 4 Connect. Rep. 85 ; 2 Kames on Eq. (3d edit. 1778), 365 ; 1 Gill & Johns. 492 ; 4 Maule & Selw. 20 ; Phillips *v.* Hunter, 2 H. Black. 410 ; 2 Kent's Comm. (3d edit.) Lect. 37, pp. 119, 120. " A decree," says Judge Story, " by a foreign court, dismissing a claim, is conclusive against the plaintiff, and he cannot again renew the controversy in a foreign court or country." Story's Conflict of Laws, 499.

In the Bank of the United States *v.* Beverly et al., 1 Howard, 134, this court ruled, " that an answer in chancery, setting up as a defence the dismission of a former bill filed by the same complainants, is not sufficient unless the record be exhibited:" Here, the same matter is set up, by the defendants' plea, as a bar to the plaintiffs' bill or petition, and sustained by the exhibition of the record, and therefore is sufficient.

In Wright *v.* Diklyne, 1 Peters's C. C. Rep. 199 – 202, it is held, " that the dismission of a bill in chancery is not conclusive against the complainant in a court of law ; although the bill may have been brought for the same matter. But in a court of equity such dismission would be a bar to a new bill."

But it is contended that the decree by the Court of Chancery was not upon the merits, but simply a dismissal of the complainants' bill for want of proof, and therefore not conclusive. The record, however, shows that there was an answer to each of the several bills of the complainants, and the case regularly brought on for a hearing on the pleadings, and after argument by counsel for both parties, the court dismissed the bills, and decreed that the funds be paid to the defendant; and that the complainants pay the defendant his bill of costs. This being a final and absolute decision in the cause, may be pleaded in bar to a new bill. " A decree of dismission of the complainant's bill, signed and enrolled, may be pleaded in bar to a new bill." 1 Vernon, 310 ; 3 Atk. 809 ; Rattenbury *v.* Fenton, Cooper's Sel. Cas. 60 ; Price *v.* Boyd, 1 Dana, 436 ; 4 Johns. Ch. Rep. 142 ; 7 ibid. 1 ; The same, 286 ; 5 Littell, 514.

Judge Story, in his treatise on equity (vol. 2, p. 739, § 1523, edit. of 1839), says, — " A former decree in a suit in equity between the same parties, and for the same subject-matter, is also a good defence in equity, even although it be a decree merely dismissing the bill, if the dismissal is not expressed to be without prejudice." Cooper's Eq. Pl. ch. 5, pp. 269 – 271 ; Mitford's Eq. Pl. by Jeremy, 237 – 239. This principle of equity was applied by the Court of Exchequer to the present plaintiffs' bill, referred to and incorporated in the plea in bar. Jones and Pool *v.* Nixon, Executor of Aspden, 1 Younge's Exchequer Rep. 359. The syllabus of that case reads thus : — " A plea of a former suit and decree signed and enrolled in the Court of Chancery, in respect to the same matters, allowed, though the bill in that court was dismissed, not on the merits, but for want of evidence."

The same principle was recognized in Pickett *v.* Loggon, 14 Vesey, 232, 233. The chancellor remarks, in the course of his opinion, that if a party thinks proper to bring his cause to a hearing, &c., and the cause capable of being opened, and then makes default, it is very difficult, and would be rather mischievous, to treat such conduct merely as a nonsuit at law. " If," says the chancellor, " the judgment in the former suit, such as it was, would have barred the proceedings in this suit, it was upon the defendant to set up that bar in some shape, either by a plea in bar, or by an answer insisting upon the same benefit as if it had been pleaded in bar. Whether, in either shape, that judgment or decree would have been an absolute answer to this proceeding, I profess to entertain some doubt. But I cannot see why, if a second suit is permitted, there

may not be a third, and so on. But the defendant may waive the benefit arising from pleading the former decree, or insisting upon it by answer, and proceed to answer the merits of the plaintiff's bill without reference to the former decree as a bar."

The case of Holliday and Coleman, reported in 2 Munf. 162, is in some respects much like the present. No evidence in that case was given by either party. The defendants in the first suit demurred to the complainants' bill, and also answered at length. On the hearing, the chancellor sustained the demurrer, and dismissed the bill. The complainants filed another original bill, and the defendants pleaded the decree dismissing the former bill in bar ; and the court sustained the plea. " A decree," says the chancellor, " by a court of competent jurisdiction, dismissing a bill upon the ground that the deed upon which the complainant claimed was fraudulent, is a complete bar to another original bill to try the validity of the same deed ; the proper remedy, if such decree be erroneous, being by appeal, writ of error, supersedeas, or bill of review, and not by original bill."

The complainants, Mrs. Jones and Mrs. Pool, should have appealed from the decree of the vice-chancellor dismissing their bill, or petitioned for a review. Such was the course pursued by the parties in the case of Kosciuszko's will. Armstrong *v.* Lear, 12 Wheat. 169.

" Equity will not entertain jurisdiction of a matter which the party has had an opportunity of litigating in another court, and which had there been decided against him, unless it appears that there existed circumstances, &c., which prevented his making his defence, or trying the question." M'Clure *v.* Miller, 1 Baily's Eq. Rep. 170 ; Henderson *v.* Mitchell, ibid. 113.

" When the party seeking relief, by a petition for a rehearing, had knowledge of the evidence before the decree, or by reasonable diligence or inquiry might have obtained it, he is not entitled to relief." Baker *v.* Whiting, 1 Story, 218.

" A direct final judgment or decree of a court of competent jurisdiction is for ever conclusive and binding, as to the subject-matter, between the same parties, and all who are privies in law or estate, although a contrary decree upon the same subject-matter be subsequently made as to the other persons who were neither parties nor privies to the first decree, and who are not therefore bound by it." Marigarth *v.* Deas, 1 Baily's Eq. Rep. 284.

" When a matter has once been adjudicated by a competent jurisdiction, it shall not again be drawn in question ; nor will parties be permitted again to litigate what they had once had an opportunity of litigating in the course of a judicial proceeding ; but whatever might properly have been put in issue in that proceeding shall be concluded to have been put in issue and determined." McDowell *v.* McDowell, 1 Baily's Eq. Rep. 324.

" When a party has had it in his power to ascertain the importance of testimony before the hearing of his case, and has neglected to do so, and to obtain the testimony, a court of equity will not grant a rehearing of the case, on the ground that the importance of the evidence had been ascertained after the decision, although the justice of the case might be promoted by it." Prevost *v.* Gratz, 1 Peters's C. C. Rep. 365 – 379; 1 Paige's Ch. Rep. 574; 1 McCord's Ch. Rep. 241; 1 Littell, 325 and 137.

And the rule at law is the same as in equity. " Whatever was, or might have been, decided in a court of law or equity is conclusive in a second proceeding between the same parties or their representatives." Heller *v.* Jones, 4 Binney, 60; Heimes *v.* Jacobs, 1 Pennsylv. Rep. 152; Fishle *v.* Fishle, 1 Blacks. R. 360.

" A former suit for the same cause of action, in which the defendant obtained a verdict, is a bar to a second suit, although such verdict was rendered on the erroneous ground that the plaintiff's cause of action had not then accrued, when in fact the plaintiff had at the time a good and perfect cause of action." Morgan *v.* Plumb. 9 Wend. 287.

" It is a principle universally acknowledged, that the judgment or decree of a court, having jurisdiction is not only final as to the matter determined, but as to every other matter which the parties might litigate in the cause, and which they might have had decided."

Per Kent, Justice, on page 502. " Every person is bound to take care of his own rights, and to vindicate them in due season, and in proper order. This is a sound and salutary principle of law. Accordingly, if a defendant, having the means of defence in his power, neglects to use them, and suffers a recovery to be had against him by a competent tribunal, he is for ever precluded."

" The general rule is intended to prevent litigation, and to preserve peace; and were it otherwise, men would never know when they might repose with security on the decisions of courts of justice, and judgments solemnly and deliberately given might cease to be revered, as being no longer the end of controversy and the evidence of right."

" The principle prevails both in courts of law and equity. In bills of review which are brought before the same tribunal to review a former decree, it is a settled maxim of equity, that no evidence of a matter in the knowledge of the party, and which he might have used in the former suit, shall be the ground of a bill of review." Le Guen *v.* Governeur & Kemble, 1 Johns. Cas. 492 and 502.

The application on the part of the petitioners for admission as parties, in this case, to claim the estate of the testator, in opposition to the representatives of John Aspden of Lancashire, whose title

to the same, as the heir at law of the testator, was declared by the Circuit Court, in their decree, on the 26th of December, 1833, is made under circumstances little calculated to obtain the favorable consideration of a court of equity. From August, 1825, to July, 1830, the complainants' bill was pending, and no attempt on their part was made to prove their relationship to the testator, and establish their right to the estate, as his heirs at law. They had the most ample opportunity to establish their claim to the estate ; and having neglected to do so, they are concluded by the decree of the court, dismissing their bill.

In April, 1830, John Aspden of Lancashire appeared in the Circuit Court, and obtained leave to issue a commission, in the case of Packer *v.* Nixon, Executor of Matthias Aspden, of April session, 1828, No. 1, to England, to prove his relationship to the testator. Numerous witnesses were examined, both in England and America, proving his relationship to the testator. And a report by the master, upon the evidence, declaring him to be the heir at common law, on the paternal side of the testator ; and on the 26th of December, 1833, a decree in his favor of the personal estate of the testator, as his heir at law. During a period of many years, these claimants watched the progress of a tedious and most expensive litigation, between the heir at law and next of kin to the testator ; the former claiming the estate under the will, and the latter under the intestate laws of Pennsylvania. And immediately after the decision of the Circuit Court giving a construction to the will, by which the heir at law became entitled to the personal estate of the testator, they appeared in court, ready and willing to deprive the said John Aspden of Lancashire of the character of heir at law, and to substitute themselves as such, by an attempt to revive a claim which had been twice decided against them, and that, too, after neglecting, from 1825 to 1834, to offer a particle of evidence in support of it. It would be most iniquitous to suffer them to do so. *Vigilantibus non dormientibus servit lex.*

Upon general principles, and upon a review of the equitable circumstances in favor of John Aspden of Lancashire, who stands in the place of the defendant, the plea in bar by the defendant to the plaintiff's petition ought to be sustained, and judgment rendered for the defendant.

The counsel for Mrs. Poole and Mrs. Jones, and for John A. Brown, administrator of John Aspden of London, made the following points.

I. The plea in bar is not sufficient in law : —

1. Because the bills in this case, and the decrees in chancery and in the Exchequer, in England, pleaded in bar to them, are not between the same parties.

2. Because they are not in relation to the same subject-matter.

3. Because they are not of the same quality, or in the same right.

4. Because the decree of dismission was not made by a court having competent jurisdiction, under the circumstances of the case, to conclude the appellees.

II. These pleas are not proved : —

1. Because there is no evidence to support them.

2. Because the evidence does not show them to be *ad idem* with the bills filed in this case.

3. Because there is no proof that the letters taken out by John A. Brown are ancillary to those obtained by Mrs. Jones and Mrs. Poole, in London.

4. Because the decrees are neither signed nor enrolled.

III. The dismission, if proved, is no bar to the appellees : —

1. Because there was no decision on the merits.

2. Because no proofs were taken.

3. Because there has been no construction given to the will of M. Aspden, either by the Court of Chancery or the Exchequer.

4. Because the various objections made to the sufficiency of the plea show it to be invalid as a bar.

IV. The plea is to the whole of the bills or petitions of the appellees ; and as part of the defence is bad, the whole must be overruled.

*Mr. Reed*, after examining the second of the above points, relating to the sufficiency of the evidence, proceeded.

The question of evidence need not be further referred to. The question now is, is the plea in bar sufficient, assuming its averments to be proved. We do not come here to dispute any general principle as to the conclusiveness of competent foreign judgments. It is a doctrine, in its general application, of "repose," and hence of high morality. It is not technical, as distinguished from reasonable. On the other hand, its application is sometimes exquisitely technical. A decree in chancery, dismissing a bill "for want of evidence," is a bar. A decree dismissing a bill "for want of prosecution," is no bar. In Rosse v. Rust, 4 Johns. Ch. Rep. 300, no party appeared, and the bill was dismissed for want of prosecution, and held to be no bar, "because the merits were never discussed." Yet, substantially, there is no difference between that case and this, but as much discussion of merits in one as in the other. In the case now before the court, it is in evidence that Sir Edward Sugden advised the solicitor of petitioners to stay out of court and have his bill dismissed ("struck out of the paper") for technical want of prosecution. He refused, went into court to make an effort to have it referred to a master, and it was dismissed for want of evidence. No discussion of merits. The decrees of dismissal here pleaded were not on hearing, not on evidence, not

on merits, but on default of peculiar nature, from extreme poverty of parties. This poverty is clearly proved.

The rule of conclusiveness of a foreign decree becomes technical in the extreme when thus applied; and courts are bound, before they apply it to the exclusion of meritorious claimants from a hearing, to see that every technical requisite exists.

These decrees, then, it is contended, have none of the technical requisites.

They are not, — 1. Between the same parties. 2. Not on the same subject-matter. 3. Not, in one sense, by competent tribunals. These points, in one aspect, must be considered together. In another, they are distinct.

There are two parties, petitioners, before this court. 1. Janet Jones and Mary Poole, as heirs of John Aspden of London. 2. John A. Brown, administrator of John Aspden of London. To each there is a separate plea in bar.

1. The first petition is of two coheiresses of a decedent, widows. The decree pleaded is a decree of dismissal of the bill, Janet Jones, and Thomas Poole, and Mary, his wife, administrators of J. Aspden. Putting out of view, for the present, this character as administrators, can a decree against husband and wife be pleaded in bar to a bill by the wife surviving the husband? Reeve v. Dolly, 2 Simons & Stuart, 464; Calvert on Parties in Equity, 272 (17 Law Library). This was a bill by wife, by her next friend, against husband and trustees of wife's separate property. Plea, a bill pending by husband and wife against the trustees. Held to be no bar, because dismissal of husband and wife's bill is no bar to wife's separate bill. The bill of husband and wife is the husband's bill, which he may bar by release. Duvall v. Covenhoven, 5 Paige, 581. If Thomas Poole had released this claim, it would have been a defence to bill by him and his wife in England. Yet a decree against them in England on such a defence would surely be no bar to suit here by his widow. This suit is against a different fund. Joint decree and order of payment vests property in husband. Calvert, 271; Ward on Legacies, 64 (18 Law Library). In this view these proceedings not between same parties.

2. A far more serious and interesting question arises on application of this plea to Mr. Brown's petition. He sues here as the American administrator, under letters granted in Pennsylvania, of John Aspden, of London. The parties to the English bills were the British administrators of J. Aspden, under a different commission, and with different responsibilities, and the question then is distinctly and for the first time presented, whether a judgment of any sort, by confession, default, or on hearing, against an administrator in one country bars the suit of an administrator in another and foreign jurisdiction. The law of Pennsylvania on the subject of foreign administrations is clear. From 1705 to 1832, a suit by an administrator in a sister

State could be maintained. McCullough *v.* Young, 1 Binney, 63. But never by a British or foreign administrator. Græme *v.* Harris, 1 Dallas, 456. In 1826, estates of decedents were made the subject of taxation, and in 1832 (Purdon, 911), all extra territorial letters of administration were invalidated. At no time in Pennsylvania has there been any privity between a British and a domestic administration. If John Aspden or his English administrators had obtained a decree in England, it would be inoperative here. No privity between them and Mr. Brown, no privity between Nixon in England and Nixon in the United States. Brodie *v.* Bickley, 2 Rawle, 431. The administrator with will annexed of one domiciled in England, proves the will in Massachusetts ; he is not to account for English assets. Boston *v.* Boylston, 2 Mass. R. 384. The Pennsylvania act of assembly in terms is the same. Purdon, 913. If J. Aspden's British administrators had suffered a judgment against them in Pennsylvania, it would have no effect, the foreign administration being a nullity. Borden *v.* Borden, 5 Mass. R. 67. Administration confers rights and creates liabilities coextensive with jurisdiction that confers it. Mothland *v.* Wireman, 3 Penn. Rep. 185. An Irish administrator releases à bond of intestate, no bar to suit by English administrator. 3 Dyer, 305. Same principle here. Vaughan *v.* Barret, 5 Vermont R. 333. If J. Aspden's English administrators had sued in Pennsylvania, and had judgment and execution, it would be no bar to suit by Pennsylvania administrator. Pond *v.* Makepeace, 2 Metcalf, 114. To a suit by Pennsylvania administrator, foreign executors come and make defence, the plaintiff entitled to recover by virtue of his distinct domestic office. Willing *v.* Perot, 5 Rawle, 264. So Vaughan *v.* Northup, 15 Peters, 1 ; Morrel *v.* Dickey, 1 Johns. Ch. R. 153 ; Doolittle *v.* Lewis, 7 Johns. Ch. R. 47 ; Woodin *v.* Bagley, 13 Wendell, 455. Creditors must be protected. Jenkins *v.* Freyer, 4 Paige, 51. In Pennsylvania, commonwealth always a creditor.

From these authorities, it clearly results that there is no privity between English administrator whose bill was dismissed, and Pennsylvania administrator who now sues. A decree of dismissal of their bill cannot bar ours in so different a right. It is no answer to say the English decree was a decision of John Aspen's right. It was the decision of no right. It was a dismissal through neglect of English administrators, — a default from poverty. Suppose American administrator to be a creditor, such a dismissal could be no bar. This court will not inquire whether he is or not. Pennsylvania administrator represents the commonwealth, which always is a creditor.

But again, Matthias Aspden, at his death, had property in England, France, and the United States. Of the French funds we know nothing. They never were in England. On his death, and Nixon's probate of will in England, the English funds vested in him

as English executor. As American executor, Nixon had American funds. His rights were wholly distinct. 2 Mass. R. 384 ; 3 Penn. R. 185. The funds were distinct. The British courts had no jurisdiction over the American funds. Their jurisdiction tested by power to enforce their decrees. That confined to England. Mr. Nixon never was in England, and not, therefore, liable to attachment. The British proceeding, therefore, strictly *in rem*, and the furthest extent of its conclusiveness is as to English funds. Hence not decree of competent tribunal, and no bar. White *v.* White, 7 Gill & Johnson, 289.

No requisite of a conclusive decree pleaded in bar exists here, and this without questioning any general principle. No case has, however, been cited, except one (Phillips *v.* Hunter, 2 H. Bl. 410) in bankruptcy, nor can one be found, where British courts have gone to the extent now contended for, or held an American judgment absolutely conclusive. All are cases of British colonial decrees, and in that case doubt is expressed whether a different rule ought not to prevail. Henderson *v.* Henderson, 3 Hare, 117.

*Mr. Williams,* on the same side with *Mr. Reed,* and against the plea.

I. The pleas filed by Nixon, executor of Aspden, as defensive bars to the petitions of the appellees, are not sufficient in law.

1. Because the bills filed in the courts of Chancery and of the Exchequer and the present suit are not between the same parties.

The bill in the English Court of Chancery was originally filed by John Aspden of London, became abated by his death, and was revived by Janet Jones and Thomas Poole, and Mary, his wife ; the said Janet, Thomas, and Mary having taken out letters of administration to the estate of said John Aspden, from the Prerogative Court of Canterbury. Record, 790.

The bill subsequently filed in the Court of Exchequer was also brought by Janet Jones and Thomas Poole, and Mary, his wife, administratrix of said John Aspden. Record, 79, 80.

By the death of John Aspden, the bill in chancery ceased to be his bill. It became the bill of the parties for whose benefit it was revived (Comyn's Dig., vol. 2, pp. 410, 411, title *Chancery,* F, *Bill of Revivor* ; Story's Eq. Plead., § 367, p. 298, and cases there cited) ; and the whole interest existing in Mrs. Poole, both by virtue of letters of administration and as next of kin of the intestate, being, by operation of law and his marital privilege, vested in her husband, Thomas Poole, the bill in fact became the bill of Janet Jones and Thomas Poole. 2 Williams on Executors, 633, 634, and cases there cited.

The bill in the Exchequer, for the same reasons, was also the bill of Janet Jones and Thomas Poole.

Both these bills were thus bills filed under the authority con-

Aspden et al. *v.* Nixon et al.

ferred by the English ecclesiastical courts upon the English administrators.

As the right of the parties at the time of the decree regulates that decree (2 Howard, 466), the dismissions in both those courts were dismissions of the bills of Janet Jones and Thomas Poole, administrator and administratrix of John Aspden.

The parties to the present suit are, 1. Janet Jones and Mary Poole, both widows, and next of kin of John Aspden ; 2. John A. Brown, administrator of John Aspden, in Pennsylvania.

The parties to the English bills are thus English administrators. Those in the present suit are the next of kin of the intestate and the Pennsylvania administrator.

Are these English administrators and the Pennsylvania administrator the same parties, either in fact or in law ?  They are in fact different persons.  Are they in law the same parties ?

In Pennsylvania the law is settled, that foreign letters of administration give no rights whatever within that State.  Græme *v.* Harris, 1 Dall. 456 ; McCullough *v.* Young, 4 Dall. 292 ; same case, 1 Binn. 64.

An old act of 1705 was supposed to have given some rights to foreign administrators, but the cases cited rule that it only applied to the then English provinces, and, after the declaration of independence, to the United States.  See Justice Nelson's opinion, in Schulz *v.* Pulver, 11 Wend. 361.

In 1832, the law now in force was passed (Purdon, 911, act of 1832, § 6), declaring that no letters granted out of this commonwealth shall confer upon any person any of the powers or authorities of an executor or administrator under letters granted in Pennsylvania.  This act was merely declaratory, and made no change in the law of Pennsylvania except as regards letters of administration granted within the United States.  The same rule prevails in England.  1 Will. on Executors, 204, 205.

India, Scotch, or Irish letters, are of no avail in England.  Allison *v.* Murphy, Hard. 216 ; administration in Canterbury void in York.  See Lowe *v.* Farlie, 2 Mad. Ch. R. 101 ; Tourton *v.* Flower, 3 P. Wms. 369 ; Vanthuysen *v.* Vanthuysen, Fitzgib. 204 ; Toller, 70 ; Beirn *v.* Cole, Ambler, 416 ; Pipon *v.* Pipon, Ambler, 25 ; 1 Com. Dig. *Administrator*, B 3, p. 494 ; Jenkins *v.* Freyer, 4 Paige, 50 ; Woodin *v.* Bagley, 13 Wend. 453.

The principles of all these decisions will be found stated in 1 Will. on Executors, 236, 237.

The powers of these different administrators extend only to the limits of the sovereignties creating them, and neither allows the other to intermeddle with any assets within their respective jurisdictions.  See bond required of an executor of non-resident testator in Pennsylvania, which applies only to assets within the Commonwealth, act of 1832, § 15.  Purd. 913.

They are not, then, in law; the same parties.

Nor are they privies.  Adams *v.* Savage, Salkeld, 40.

Administrator in Devonshire cannot have *sci. fa.* on a judgment in Westminster.   Higgins *v.* York Buildings Company, 2 Atkyns, 44.

Beames's Pleas, 300; administrator *de bonis non* cannot revive a bill filed by a former administrator, because there is no privity between them.   Story's Conflict, § 522, p. 436 ; Tallmage *v.* Chappel, 16 Mass. R. 71 (see p. 73) ;  Grout *v.* Chamberlain, 4 Mass. R. 611, 613.

There is no privity between an executor and an administrator *de bonis non cum test. ann.*, and the latter cannot sue out a writ of error on a judgment recovered by the former.

The administrator *de bonis non* may have a new action.   C. J. Parsons rests this decision upon the English authorites.   Yelverton, 33, 83 ; Latch, 140.

It required a statute, 17 Car. II., c. 8, to enable such succeeding administrator to obtain the fruits of a judgment obtained by his predecessor ; and therefore, even in this case, where letters are granted by the same ecclesiastical court, there is only a privity by statute, not by the common law.

So, in Pennsylvania ; the succeeding administrator completes the administration of the former by virtue of an express authority conferred by act of 1834.   Purd. 440.   (See Allen *v.* Irwin, 1 Serg. and Rawle, 554.)

But this statute in England and the act of Pennsylvania applies only to administration granted by these respective countries ; neither relates to foreign letters.   Bohun, Cur. Can. 186 ; Tourton *v.* Flower, 3 P. Wms. 369.

Lee *v.* Bank of England, 8 Vesey, 44.   In this case Sir William Grant says, that the persons (executors) in America are not the personal representatives of the testator, within the meaning of the laws of this country.   And this was where the executor refused to prove the will in England, the M. R. saying, if he refuses and is absent, you may have administration here.   Arnold *v.* Arnold, 2 Mylne & Craig, 271.   Acc.

The American cases are equally strong.   Goodwin *v.* Jones, 3 Mass. R. 514 ; 2 Mass. R. 384 ; 9 Mass. R. 347 ; Doolittle *v.* Lewis, 7 Johns. Ch. R. 46 ; Morrel *v.* Dickey, 1 Johns. Ch. R. 153 ; Chapman *v.* Fish, 6 Hill, 555.

In this court, the same law has been laid down repeatedly.   Fenwick *v.* Sears, 1 Cranch, 259 ; Dixon's executors *v.* Ramsay's executors, 3 Cranch, 319 ; Kerr *v.* Moon, 9 Wheat. 56 ; Smith *v.* The Bank of United States, 5 Peters, 529 ; Vaughan *v.* Northup, 15 Peters, 1.   (See Judge Story's opinion, pp 5, 6.)

But as the law of the forum in which the bar is set up must regulate its effect, it is particularly with Pennsylvania law we have to do

here ; and the authorities in this State are conclusive. Brodie *v.* Birkley, 2 Rawle, 436 ; Mothland *v.* Wireman, 3 Penn. R. 186 ; Willing *v.* Perot, 5 Rawle, 264 ; Purdon, 443, act of 24th February, 1834, § 47, requiring executors to pay legacies under the direction of the Orphan's Court.

From these authorities, it results, —

1. That administration granted by each jurisdiction is paramount.

2. That administrators are, even *within the same jurisdiction,* privies only by virtue of statutory enactments, and in no case by the common law.

3. That they are not the general representatives of the intestate, but only as respects his estate in the country from which they derive their authority.

4. And that therefore foreign administrators cannot be in any sense the same parties or privies with those in the State of Pennsylvania.

On this ground, the plea in bar is insufficient.

Again, the parties in these suits are different, because the English bills are bills by a husband and wife, which are always considered bills of the husband only. Smith *v.* Myers, 3 Mad. 474 ; Reeves *v.* Dolby, 2 Sim. & Stu. 464 ; Hughes *v.* Evans, 1 Sim. & Stu. 185 ; Mole *v.* Smith, 1 Jac. & Walk.; Paulet *v.* Delaval, 2 Ves. sen. 666 ; Griffith *v.* Hood, 2 Ves. sen. 451.

Bill by husband and wife is the husband's bill. Where any thing is for the separate use of the wife, the bill should be brought by a *prochein amy*, otherwise it is the husband's bill. Owden *v.* Campbell, 8 Sim. 551.

Suit by husband and wife is suit of husband, and if bill be dismissed or decree made adverse to her interests, the wife may bring a fresh bill by her next friend. Wake *v.* Parker, 2 Keen, 73 ; Grant *v.* Vanshoonhoven, 9 Paige, 257 ; Duvall *v.* Covenhoven, 5 Paige, 581.

The husband, when he sues in right of his wife, must make her a party, but he sues for his own benefit, and he may release or assign his claim for a valuable consideration ; and if a decree is made for the payment of money, or if the claim is otherwise reduced into possession, it will pass to his representatives. Wintercast *v.* Smith, 4 Rawle, 182 ; Lodge *v.* Hamilton, 2 S. & R. 493.

As there is no *prochein amy* a party in the English bills, they are then the husband's bills, and the dismission cannot be pleaded in bar to a fresh bill by the wife, even in England, much less in a foreign jurisdiction.

For this reason, then, the English and American bills are not between the same parties.

II. The English bills and the suit in Pennsylvania are not for the same subject-matter.

These were *bona. notabilia* both in England and Pennsylvania. Record, 116 : 16.

The assets in Pennsylvania are subject only to the control of the Pennsylvania administrator, and those in England to that of the English administrator ; neither can affect any portion of the estate of the decedent not within the jurisdiction from which they receive their appointment.

1. By suit ; or

2. By assignment.

3. And each must account to, and are responsible only for, the assets within the State, province, or diocese which appoints them.

1. They cannot affect these assets by suit. Borden *v.* Borden, 5 Mass. R. 77 ; Pond *v.* Makepeace, 2 Metcalf, 114 ; judgment recovered by a Rhode Island administrator in Massachusetts, and an execution returned satisfied. Still this judgment was no plea in an action for same debt by the Massachusetts administrator, because that debt was *bona notabilia* in Massachusetts. (See cases referred to at p. 117.)

The same rule prevails in England. 1 Dowl. & Ryl. 35, 16 E. C. L. R. 15; Attorney-General *v.* Dimond, 1 Cromp. & Jervis, 356, 370 ; 2 Wms. on Executors, 1020.

2. Nor by assignment. Cutter *v.* Davenport, 1 Pick. 80 (see 83, 84); administrator in Vermont cannot assign a mortgage debt due by a citizen of Massachusetts. It is *bona notabilia* in Massachusetts, and must be administered there. So are simple contract debts, and they must be collected where the debtor lives. Chapman *v.* Fish, 6 Hill, 554.

The release of a note dated at Albany by a foreign administrator is no bar to a suit by a New York administrator, because it is *bona notabilia* in that State. The release is inoperative. Vaughan *v.* Barret, 5 Vermont R. 333 ; 3 Dyer, 305.

New York administrator releases a debt due from a resident of Vermont. No plea to a suit by Vermont administrator. Thomas *v.* Wilson, 2. N. Hamp. R. 291.

Foreign administrator cannot indorse a note so as to enable the indorser to sue in New Hampshire in his own name. Hearns *v.* Burnham, 5 Greenleaf, 261 ; Lee *v.* Harens, 1 Brayton, 93 (Vermont); Willing *v.* Perot, 5 Rawle, 264.

This last case was a controversy between the Pennsylvania administrator and the assignee of a foreign administrator, and it was held that the former must always prevail.

3. Administrators are bound to account within the jurisdiction appointing them, but only for the *bona notabilia* within that jurisdiction. Boston *v.* Boylston, 2 Mass. R. 394; Dawes *v.* Boylston, 9 Mass. R. 337.

Suit on probate bond for assets in administrator's hands, he being also administrator *cum test. ann.* in England. Held that he was

accountable in Massachusetts only for the goods, &c., collected there.   Stevens *v.* Gaylord, 11 Mass. R. 257; Hooker *v.* Olmsted, 6 Pick. 9, 482, 483.

Plaintiff not entitled to execution against Massachusetts administrator for sums collected in Connecticut, under letters granted to same person there.   Distribution of these assets must be made in that State, though the estate of decedent was insolvent in Massachusetts and solvent in Connecticut.   Fay *v.* Haven, 3 Metcalf, 114, 115 ; Peck *v.* Mead, 2 Wendell, 471 ; Orcut *v.* Orms, 3 Paige, 465.

Administration granted in New York and Vermont to the same person.   He must account in each State for the goods inventoried, as found in them, respectively, at the death of the intestate.   Harrison *v.* Sterry, 5 Cranch, 289 ; Smith *v.* Bank, 5 Peters, 523 – 525 ; Vaughan *v.* Northup, 15 Peters, 1, 5, 6 ; Vrom *v.* Vanhorne, 10 Paige, 555.

If, then, foreign administrators cannot affect the assets in Pennsylvania by suit, or by assignment, directly, how can they be affected by mere omission on his part to prosecute a claim to other assets, out of the jurisdiction of Pennsylvania, beyond the control of the Pennsylvania administrator, who could not interfere with, become a party to, or regulate in any way his proceedings abroad ?

The three cases cited above, from 2 Rawle, 436, 5 Rawle, 264, and 3 Pennsylvania, 188, show it to be the law of Pennsylvania that such proceedings cannot be a bar, as the assets are to be retained by the Pennsylvania administrator, to be administered there.

The fact that Nixon appeared to the suits in England does not vary the case.   He appeared only as English executor, under letters from the Prerogative Court to protect the English funds.   Such appearance is coextensive only with his authority as English executor.   As American executor, he could not have been heard. Stevens *v.* Gaylord, 11 Mass. R. 257 ; Vaughan *v.* Northup, 15 Peters, 1.

In both these cases, and in several others previously cited, the administrators were actually served with process ; yet the courts held that circumstance gave them no jurisdiction over foreign *bona notabilia*.

The Pennsylvania act of assembly is as strong in its terms as that of any other State and country, and excludes every possible mode of interference, either by acts or omissions ; consent on his part could not prevent its operation.

III.  The bills in this case, and the decrees in England, are not in the same rights.

The former are by Pennsylvania administrator, who is trustee,— 1.  For creditors in Pennsylvania ; 2.  For the commonwealth, as respects taxes, &c. ; 3.  For distribution, under direction of our orphan's courts.   The latter are by the administrators in England,

Aspden et al. *v.* Nixon et al.

who are trustees, — 1. For the creditors in England ; 2. For the government there, to pay duties, &c. ; 3. For distribution under direction of the courts there.

The cases previously cited establish these positions. See Story's Conflict, 439, § 524

Dodge *v.* Perkins, 4 Mason, 436. The right to sue in the United States courts depends on the citizenship of the administrator, not on that of the decedent ; for administrator is the real, not merely the nominal party.

If it is said that administrator is a trustee for next of kin, and therefore the dismission of the English bills must be a bar, the answer is, that a decree against a *cestui que trust* is no bar to a suit by a trustee who was not a party to the former case. Thomas's Trustees *v.* Brashear, 4 Munroe, 65, 68.

IV. This decree not made by a court of competent jurisdiction, either as respects the parties or the subject-matter.

To bind parties, they must be within their jurisdiction. To bind the property, it must be within their power.

The English courts had no jurisdiction over e administrator or the property in Pennsylvania.

The cases already cited establish this. The American administrator of Aspden was never summoned, could not appear, could not defend or protect his own rights, or the rights of those whom he represents.

The Pennsylvania property was not within their power, — could not have been collected or disposed of by virtue of any authority from them. Their decree in favor of the complainants, then (if it had been given), could not have been enforced. The process of sequestration and attachment would have been fruitless.

The American administrator could not have set up a decree in favor of the English administrators, if such a decree had been made, as the foundation of a suit in this country, nor as a bar to the claims of others as distributees.

It would certainly have been no evidence against John Aspden of Lancashire. Picquet *v.* Swan, 5 Mason, 40.

General principles restrain jurisdiction of all courts within their local limits. In cases of non-residents, judgments are never *in personam*, they are *in rem*, and bind only the goods attached. Bond *v.* Briggs, 9 Mass.

Even under the act of Congress, judgments must appear to be rendered by courts having jurisdiction of the parties, as well as the cause, to have full faith and credit given them. Story's Conflict, 458, § 547.

Douglass *v.* Forest, 4 Bingham, 686, takes a distinction between cases where parties owed allegiance to the country where judgment was given ; but American administrator owed none to England.

7 Gill & Johnson, 210. Chancery proceeds *in rem*, or *in per-*

*sonam*, and the power of enforcing their decrees is the test of their jurisdiction. They had here no power over J. A. Brown.

In admiralty cases the world are parties, and the whole world is therefore bound, because notice is served upon the thing itself, and all interested have, therefore, notice. But those who have no interest which could be asserted in a court of admiralty have no notice of the seizure, and cannot be considered as parties. The decree, as respects them, can therefore be reëxamined. Case of the Mary, 9 Cranch, 126, 144 ; Marshall, C. J.

But if the sentence appears to be for a cause which involves no violation of the law of nations, even admiralty sentences are not conclusive on the question of neutrality. 2 Wend. 64 ; 2 Bay, 239 ; Salucci *v.* Johnston, 4 Douglas, 224.

In this case the American administrator had no interest in the English funds, was not present there, owed no allegiance, had no notice, — in fact, became administrator only in 1834, after the decrees were pronounced. He can be, therefore, upon no principle, considered a party ; nor can the decrees be considered, as respects him, *in personam*. If they are not so, they are no defensive bar. Bates *v.* Delavan, 5 Paige, 305, is clear to this point. Picquet *v.* Swan, 5 Mason, 40.

V. This plea is not proved. no evidence being taken by respondent. But even our evidence shows that, —

1. It is not proved that the bills in England and the present suit are *ad idem*. See former part of this argument.

2. It is not proved that Brown's letters were ancillary to those in England ; not that Brown acted as attorney for Poole and Jones.

3. It is not proved that the decrees were signed and enrolled ; and without being so they are no bar. Witnesses clearly establish that they were not. Record, 96, 100.

Only two cases have been cited against this position : —

Prettyman *v.* Prettyman, 1 Vern. 310, has been overruled. See Beames's Pleas, 219, 220.

Dodson *v.* Oliver, 1 Eagle & Jones, is a tithe case, and in these cases the practice of the courts is peculiar, not governed by the rules of equity practice. The book cited is not in this country; a note of it is found in Seaton's Decrees.

The English cases are clear. The American are equally strong. Bennet *v.* Winter, 2 Johns. Cas. 205 ; Gill *v.* Scott, 1 Gill & Johns. 393 ; Halsted's Digest, 176 ; Minturn *v.* Tomkins, 2 Paige, 102 ; Thomas *v.* Harvie, 10 Wheat. 148.

The replication denies the fact of the enrolment, and every other fact except what are specially set forth in it.

VI. The dismission under the circumstances proved is not a bar. The only discussion was in relation to a reference to the master ; no pretence that any took place in relation to the merits.

Parties were poor. Record, 101. Gregson died insolvent.

oo *

Record, 98. Application made to Dugdale for a loan. Record, 101.

No construction of the will was given. Brandlyn *v.* Ord, 1 Atk. 571 ; 1 Smith's Chancery Prac. 246 ; Lord Bacon's Orders, 4 ; Bacon's Works, 511 ; Rosse *v.* Rust, 4 Johns. Ch. R. 300 ; 15 Vesey, 231.

Lord Eldon doubts whether, when cause has not been heard on its merits, and an opportunity to be heard has been given, a decree will be any bar. Can *v.* Can, 1 P. Wms. 723.

These decrees are no bar, because they do not bind the party for whose benefit they are pleaded.

The next of kin have no interest in this question.

John Aspden of Lancashire alone will be benefited by a decision in favor of these pleas.

He is not a party to, nor bound by, the proceeding in the English courts. Henderson *v.* Henderson, 3 Hare, 117 ; Atkinson *v.* Turner, Barnard. 77 ; Rees *v.* Lawless, 4 Littell, 219 ; Thompson v. Clay, 3 Munroe, 361, 362 ; Davis *v.* Hunt, 2 Bailey, 412, 415.

VII. This plea is to the whole bill ; and if part of the defence is bad, the whole must be overruled. Beames's Pleas, 42, 44 ; Chamberlain *v.* Agar, 2 Ves. & B. 259 ; Jones *v.* Davis, 16 Ves. 262.

*Mr. David Hoffman*, in support of the pleas and in conclusion.

(All those parts of *Mr. Hoffman's* argument, which do not apply to the point decided by the court, are omitted.)

The British and American cases in support of such pleas in bar are quite too numerous to be further dwelt on, in the general view I am now taking of the *exceptio rei judicatæ;* but the opinion of Chief Justice De Grey, in the Duchess of Kingston's case, 11 State Trials, 201, and of Chief Justice Willes, in the case of Prudham *v.* Phillips, Ambler, 763, are leading decisions, and show that the doctrine had made its foundations deep in the British system of jurisprudence, long before the prize courts had carried it to an iniquitous extent. The whole current, also, of our own authorities go the same length ; and whether the decision be a domestic or a foreign one, the matter decided is equally respected. Having dwelt sufficiently upon the general nature, grounds, and just application of the weight accorded to the *exceptio rei judicatæ*, I now proceed to inquire into, —

II. This doctrine, as practically enforced, under various sound distinctions, in British and American courts.

In the case now before the Supreme Court, the pleas in bar of former judgments in foreign courts are fortified by the following evidence.

Authenticated copies of the records, together with the evidence taken under the defendant Nixon's commission, showing, —

1. A final decree upon a regular hearing of the cause, before the counsel on both sides, in the British High Court of Chancery.

2. That this decree of dismissal was for want of any evidence on the part of the complainants, from 1st August, 1825, to 17th July, 1830.

3. No caveat was entered against the signing and enrolling of said decree.

4. No rehearing, or review, or appeal, was prayed.

5. A new original bill was filed in the Exchequer, twenty-three days after the dismissal; no evidence there produced, and no attempt to procure it; bill dismissed from the Exchequer, a year after it was filed, upon the express grounds, 1st. That this was a final decree in chancery; 2d. That the *exceptio rei judicatæ* filed by Nixon was a flat bar to any further proceeding, although the merits as to heirship had been in no way litigated in the Court of Chancery; and 3d. That a decree of dismissal, for want of evidence, after a hearing, according to the rules of court, and the practice in chancery, was conclusive upon the Court of Exchequer, and therefore the complainant's bill must be dismissed. Was that decision correct, according to the English law? and does the American conform thereto? and if so, will not the American courts deal with these records, and with all the attendant circumstances (especially as between British subjects) in the same way as British courts would deal, and have dealt, with the matter? An affirmative answer to these questions seems the unavoidable result of what has already been stated, and of all the circumstances of the case; for courts are competent to look at the entire judicial and extrajudicial *res gestas.* But, as I have undertaken to consider the subject more in detail, in this second division of my argument, I shall now proceed to refer to a number of British and American cases, and to comment upon some of them.

The correctness of the decision in the Exchequer will appear from the following cases and books, in addition to those already cited. 2 Ld. Kames on Equity, 365; Martin *v.* Nicolls, 3 Simons, 485; Bowles *v.* Orr, 1 Younge & Collyer, 464. "A decree of dismission of complainant's bill, after it is signed and enrolled, is a bar to a new bill, between the same parties, and for the same matter." Cooper's Eq. Pl., ch. 5, 269, &c., and authorities there cited. "A plea in bar, stating a dismissal of a former bill, is conclusive against a new bill, if the dismissal was upon hearing, and if that dismissal be not in direct terms ' without prejudice.' " 1 Vernon, 310; 1 Bro. Parl. Cases, 281; 1 Chancery Cases, 155; Mitford's Pleadings in Eq. (Jeremy's edit.) 237, &c.

In Pickett *v.* Loggon, 14 Vesey, 232, the chancellor says, — "If a party thinks proper to allow his case to come to a hearing,

&c., and the cause is capable of being opened, it is very difficult, and would be rather mischievous, to treat such conduct merely as a nonsuit at law." How a nonsuit necessarily differs from a dismissal of a bill, after answer and hearing, will be noted hereafter.

I will now advert to some American authorities and cases, which speak the same language; and then again return to British authorities, and apply them both to the case at bar.

1. Where a bill in equity states certain things, and not sufficient proof is offered by complainant to sustain his allegation, the bill must be dismissed; so, if neither denied nor admitted, but complainant be left to his proof, the bill must be dismissed, if there be no proof at the rule day. 2 Ohio Rep. 22 ; 3 Ohio Rep. 291.

2. Equity will not grant a new trial at law, where the party seeking it has been guilty of any neglect in obtaining his evidence, even though such neglect were occasioned by the ill-judged advice of his counsel, and though his bill charges positively that the demand against him has been fully discharged. 2 Ohio Rep. 312 ; 6 Ohio Rep. 82.

3. Where a second bill is filed to obtain a second injunction (the first being dismissed), in relation to the same transaction, and between the same parties, it will not be enough to allege in that second bill a new ground of equity not suggested in the former bill. It must also be shown that the new matter alleged did not exist at the time of the first bill ; or that, if it existed, it was unknown to the complainant. Bank of the United States *v.* Shultz, 3 Ohio Rep. 62.

4. No matter can be taken *ad aliud examen*, which has been finally acted on by another competent jurisdiction. The only remedy is by appeal, or error, or by a rehearing, or review ; 4 Ohio Rep. 330 ; or unless there has been fraud in the opposite party ; or finally pure accident, without any fault or negligence of himself, or of his agents. 4 Ohio Rep. 492 ; 5 Ohio Rep. 183.

5. A decree which puts an end to the suit is not the less final because it is subject, within a limited time, to be reversed upon a bill of review. 5 Ohio Rep. 460.

I have alluded several times to the admitted fact in this case, that both of the parties litigant are British subjects, claiming this property as heir at common law, both claiming descent from a common ancestor, both related to the testator in the degree of second cousins, and both claiming as eldest sons through those, respectively, whom each avers to have been the eldest son of Thomas Aspden, the common ancestor, — John Aspden of London claiming through John Aspden 1st, of Kent, whom he alleges to have been the eldest son of that Thomas ; and John Aspden of Lancaster claiming through William Aspden, whom he alleges was the eldest son of that Thomas Aspden, the admitted common

ancestor. In respect to proof, the London Aspdens have not only utterly failed to give any, either legal or moral, but no less than three decrees have been pronounced against their claim; one in the British Chancery, as has been often stated, the second in the British Court of Exchequer, and the third in the Circuit Court of the United States, upon their first application. John of Lancaster, on the other hand, gave such evidence of his pedigree and heirship as satisfied the master in his two reports, and also the court, after the most diligent inquiry. Thus, then, the matter now stands, as between these two British subjects. But Aspden of London, after nearly ten years of merely nominal prosecution, has now planted himself in such a position in an American court of equity as to call upon that court utterly to disregard all that was done in the British tribunals, and to take no cognizance of his neglects there; and yet further, that John of Lancaster's advantageous position, after all his proofs, and the decree in his favor, should also be wholly disregarded, and that he of London should be now as favorably dealt with in the American court as if nothing had ever been done either in that court or in the tribunals of his own country!.

Passing by, for the present, all that has been done in the Circuit Court in support of John Aspden of Lancaster's claim, and looking exclusively to all that John Aspden of London has not done in England during ten years, and in this country during ten years more, the inquiry naturally is (when we find these two British subjects interpleading in this court), — Shall John of London, when contending merely with John of Lancashire, be regarded by this court in precisely the same light as if he had been originally and regularly prosecuting his claim in this court, and had never been in any way concluded in the tribunals of his own country? — for to that extent does he now claim! Nixon, and now Trotter, are to be regarded, at all times, as mere stakeholders. The executor of Matthias, the testator, was called on to account for this estate to one or the other of two British subjects; John Aspden of London's claim to heirship was pronounced by chancery to be without proof; not, indeed, that he had brought some proof, and there stopped, and that the court pronounced that proof worthless, — but that, after five years, he could produce no proof at all, — and hence the court regarded that as an irresistible presumption that none existed, and so decreed. Another forum, of his own voluntary selection, also decreed that the first decree was valid, final, and conclusive; and shall not these two decrees avail here to the same extent as there? Are they not *res judicatæ*, that the fact of John Aspden's heirship does not exist? That in England this fact is for ever established is beyond all question, — every court in that island would at once decide that this fact was *res judicala*. This being clearly so, why shall John of London

be now permitted to cast all this to the winds, and say to his relative and co-subject, "Here are copies of my former bills in British courts ; I file them now in an American court, with a few verbal alterations ; we must now have another ten years of litigation here ! " for such, in truth, is the alleged right of John Aspden of London ! Is it not, therefore, fit, moral, and legal to accord to John of London (seeking equity here) exactly that, and no more nor less, than what the tribunals of his own country would give, and have given ? Why should one British subject have a measure of justice extended to him against another British subject, which the tribunals of their common country have refused to give ? And why should the court here close its eyes to all past neglects, to all the presumptions of actual want of proof involved in the fact of those neglects ? *Inter ipsos,* the decrees are not foreign, but domestic ; and, whether the one or the other, the decision at least of the Exchequer ought to close the controversy.

And here I am reminded of the very sensible and pertinent language of the late excellent Judge Washington, in the case of Green *v.* Sarmiento, 1 Peters's C. C. Rep. 80. "But it is objected," says the judge, "that the judgment may be unjust upon the merits of the case, or erroneous in point of law ; and it is asked, shall such a decision be submitted to by the courts of another state ? I answer, that the contrary of all this ought to be presumed ; and let me ask in return, what state (or nation) stands so preeminent for knowledge and virtue, as to say with confidence, that the judgments of her courts would be more just, or more consonant to law, than those that have already passed on it ? I concede that the objection may sometimes be well founded, but I am far from admitting that in all cases the evil would be remedied by a reëxamination before another tribunal, and the general good forbids that this should be done."

These foreign judgments, then, which stand unimpeached by fraud, or irregularity, or by any internal infirmity, should have accorded to them (especially when the matter of controversy rests between subjects of the same nation) precisely that effect, and no more, which would be given were the matter interpleaded by them in the courts of their own country ; what that is, we know, and has been decided in this very case, and should be everywhere ; for if a contrary doctrine be adopted, foreigners would have nothing more to do than to litigate their rights vexatiously and dilatorily for years in the equity tribunals of their own country, and when there ousted, carry on an equally annoying procedure in our tribunals, hoping to gain at length a portion of that, a title to the whole of which they have utterly failed to establish at their home, and in the midst of that very evidence which would have served them had it in fact existed.

I shall now proceed to cite some further of the leading cases

Aspden et al. *v.* Nixon et al.

and authorities, and to remark upon a few ; all of which, as it seems to me, can leave no doubt that such decrees as are relied on in the present pleas in bar will be regarded by this court, and all other courts, as conclusive ; and therefore that the pleas will be sustained.

(1.) In regard to foreign judgments, a distinction was early taken between a suit directly upon the judgment to enforce it in another tribunal, and the case where a party sets up a foreign judgment merely in bar and defensively ; and, in the former case, it has been held that the foreign judgment is only *primâ facie* correct, as no nation should be bound actively to enforce the decision of a foreign tribunal ; but that in the latter case, where it is used in defence only, the losing party has no right to institute a suit for the same matter elsewhere, and that if he does so, the judgment shall be regarded as *res judicata,* if exempt from fraud, and the jurisdiction were competent that pronounced it. Admitting this distinction, *argumenti gratia,* the present case belongs to this second class ; the decrees are used defensively; and the *exceptio rei judicatæ* is said by the same authorities to be entitled to that full measure of respect everywhere. Boucher *v.* Lauson, Cases temp. Hardw. 89 ; Phillips *v.* Hunter, 2 Hen. Black. 410 ; Story's Conflict of Laws, 500.

This distinction, however, just as it may be, has been much questioned ever since, and in favor of a less extended doctrine of conclusiveness. Mansfield, Buller, Blackstone, Eyre, and others sustain the doctrine of revision ; Nottingham, Hardwicke, Kenyon, Ellenborough, and the current of more modern authorities, down to the present hour, repudiate the distinction, and are disposed to inquire into no foreign decrees or judgments further than, first, as to the competency of the court ; second, the absence of all fraud ; third, whether (admitting the decree to the fullest extent) it does, in point of fact, embrace the matter in controversy. To this third class of admissible inquiries belongs the ordinary case of a foreign sentence of condemnation as prize, which is no bar to proof that the property was in fact neutral, as there may be many other grounds of condemnation than that of enemy's property. To the same class, also, belong all of those cases at law which do not regard decrees in equity, in certain cases ; because equity may well reject a claim which the law would enforce, and *e converso.* But, with the exception of these three classes of inquiry, the sound doctrine would seem to be, that the decree is *res judicata,* whether used affirmatively and to be enforced by a plaintiff, or defensively as against the claim of a plaintiff. But still, without now insisting upon an extension of the doctrine, which our case does not need, we repose with great confidence on the opinion of Lord Chief Justice Eyre, who, though he takes side with Lord Mansfield in the case of Walker *v.* Witter, in permitting a foreign decree to be looked into,

when directly sued on, and asked to be enforced, is equally strong in his rejecting all such right when the foreign decree is used (as in the present case) only as a defensive bar. "If we had the means," said that able judge, "we could not examine a judgment of a foreign court, that is brought before us in this manner, by the defendant as a bar. It is in one way only that the decree or judgment of a foreign court is examinable in our courts, and that is, when the party who claims the benefit of it applies to our courts to enforce it. When it is thus voluntarily submitted to our jurisdiction, we treat it as a matter *in pais*, respect it *primâ facie*, but examine as we do a promise ; but in all other cases we give entire faith and credit to foreign judgments, and consider them as conclusive upon us." Phillips *v.* Hunter, 2 Hen. Black. 410. Our case, however, needs no more than this very doctrine ; and, if we produce yet stronger cases, it is only to manifest more clearly the earnestness with which courts, at this day, sustain every means of terminating vexatious litigation, and cherish that repose so essential to the security of property and the peace of society.

And here I cannot avoid citing the remarks of Lord Kames, when he is arguing in favor of a distinction between foreign decrees that sustain a claim, and those which dismiss a claim. He thinks the former more examinable than the latter ; and though the distinction is in favor of the decree at this time in controversy, as he regards a dismissal as more exempt from inquiry than a decree that sustains a claim, yet, as I cannot but regard his argument as rather more specious than solid, I now cite with pleasure the remarks with which he closes his discussion of the distinction alluded to. "Public utility," says he, "affords another argument extremely cogent. There is nothing more hurtful to society than that lawsuits be perpetual. In every lawsuit there ought to be a *ne plus ultra ;* some step should be ultimate ; and a decree dismissing a claim is in its nature ultimate." 2 Kames on Equity, 364. To apply, in a word, these remarks to the present case, let it be borne in mind, as has been often remarked, that the dismissal was for a total want of proof, after five years of litigation, — raising, as the court justly thought, a *presumptio juris et jure* of the non-existence of the alleged fact of heirship ; that decree, moreover, was confirmed as *res judicata* by a tribunal of the present claimant's own election ; and lastly, all subsequent time has confirmed the wisdom of the preceding decisions, as the Aspdens of London are still proofless.

(2.) In the case of Bowles *v.* Orr, 1 Younge & Collyer's Exch. Rep. 464, it was held that a foreign judgment is equally conclusive as an English judgment ; but that it, like all other judgments, may be set aside here in equity, for fraud, &c., and the Lord Chief Baron, at page 468, observes, that "As the bill does not state under what circumstances the judgment was recovered, I must presume it was in respect of the same matters as are contained in the

Aspden et al. *v.* Nixon et al.

bill. Then, if so, it will be conclusive against the account sought. According to modern decisions, a foreign judgment is as conclusive against the debtor as an English one can be ; and Martin *v.* Nicholls, 3 Simons, 458, is an authority to show that a foreign judgment is conclusive against the plaintiff."

(3.) I will now state the case of Martin *v.* Nicholls, relied upon in the above case of Bowles *v.* Orr.

That case, in 3 Simons, 458, seems to go the whole length of abolishing the distinction taken by some judges between a proceeding to enforce a foreign decree, and where it is used only defensively, that is, in bar. The case was this. A bill was filed for discovery, and also for a commission to take proof to impeach a foreign judgment rendered in favor of the present defendant, who was then a suitor in the Common Pleas to enforce that judgment. Upon demurrer by the defendant in equity, he argued, that, unless the foreign judgment can be questioned in England, and the grounds taken be such as would be a defence to an action on that judgment, the complainant's bill cannot be sustained. The vice-chancellor stated that the present defendant had recovered a judgment in Antigua, and complainant relies upon the case of Walker *v.* Witter, Doug. R. 1, as authority for questioning that judgment, which is sought to be enforced in the Common Pleas. " Were I to allow this bill," says the chancellor, " it would be in effect saying, that the judgment in Antigua may be overruled by the Court of Common Pleas," and therefore he sustained the demurrer.

Now, here it will be seen, that the vice-chancellor, finding the court of Antigua a competent tribunal, and that no fraud, or want of jurisdiction was alleged, deals with the foreign judgment as *res judicata*, and as conclusive even where sought to be enforced. He regarded the doctrine of Walker *v.* Witter as advancing a frivolous distinction ; and he preferred the old opinions, and the doctrine of conclusiveness sustained by Nottingham, Hardwicke, Kenyon, Ellenborough, &c., to that of Lord Mansfield. Happily we have no occasion, in the case now before the Supreme Court, to take sides in this controversy ; for, whether Walker *v.* Witter be the sound law, or Martin *v.* Nicholls, and Bowles *v.* Orr, &c., be the better law, is to us quite immaterial, since in our case we seek not to enforce a foreign decree ; but only to rely upon it as a defensive bar ; and for that purpose there seems to be a great unanimity of opinion ; for Lord Chief Baron Eyre, who entirely adopted Lord Mansfield's distinction, is yet very emphatic in his expression, as we have just seen, that foreign decrees are final and conclusive when defensively relied on ; and this is all we have occasion to invoke. The stronger and more thorough cases, in which the earlier judges, as well as those of the present day, have agreed with Lord Hardwicke, — and his is a lustrous name, — "that where any court, foreign or domestic, that has the proper jurisdiction of the

case, makes the determination (and it be free from fraud) it is con-
clusive on all other courts,"· are nevertheless cases that need not
be urged by us in the present case ; and are only now referred to
in earnest support of the doctrine to the medium extent of our own
·case, and with no tilt of legal knight-errantry in support of one
class of judges against another class. ·Both classes entirely con-
cur, that, relied on·as a defensive bar, foreign decrees are, and of·
right ought to, be, conclusive. The doctrine, to that extent, is
surely one of repose, of judicial policy, and even necessity ; it is
a doctrine of justice, and of public policy also, since it inculcates
vigilance, and teaches suitors, and those cited into courts, that they
should not sleep over their rights, and must not deal with the tri-
bunals of justice as mere organs of legal delay, to exhaust the pa-
tience and worry out the life and purse, in order ultimately perhaps
to obtain, by compromise, a portion of that which the indolent or
unjust know they can never obtain by proofs.

In the case of Tarlton *v.* Tarlton, 4 Maule & Selw. 20, the
court goes to the full extent, and beyond, what we have need for.
In that case, which was at law, a decree in a foreign court was
relied on. The defendant stated that the decree had been obtained
against him *pro confesso*, for want of an answer, whereupon seques-
tration had issued, and the ·amount levied on the property of the
plaintiff, who had been his partner in trade ; but that the account
had been erroneously taken, &c., &c. Lord Ellenborough ruled
that the decree was conclusive, and that the defendant could not be
permitted to question the accuracy of the account taken ; that a
decree *pro confesso*, for want of answer, was *res judicata ;* and that,
as such, it was binding and conclusive, — his Lordship emphatically
adding, that "I had not thought I was sitting at nisi prius to try a
writ of error to correct the proceedings of a foreign court ! "·

Also, in the case of Richard Raynel Keen *v.* John M'Donough,
8 Peters's S. C. Rep. 308, a decree was pronounced by a Spanish
tribunal in Louisiana, after the cession of that dominion, but whilst
it was, *de facto*, in possession of Spain. The court held, that, as
the tribunal still had jurisdiction, the decree was valid and conclusive.

In 2 Story on Equity Jurisprudence, p. 911, § 1523, it is stated,
that " A former decree in a suit in equity, between the same par-
ties, and for the same subject-matter, is also a good defence, even
although it be a decree dismissing the bill, if the dismissal is not
expressed to be without prejudice. Here, the courts of equity
act in analogy to the law in some respects, — but not in all, — for
the dismissal of a suit at law, or even a judgment at law, is not, in
all cases, a good bar to another action."

We here see, that, although equity may follow the law, and deal
with a naked dismissal of a bill, "for mere want of prosecution,"
as a nonsuit, and hence no bar, yet that a dismissal of the other
kind, such as, in the present case, the dismissal on hearing; and for

want of proof, is a decree, and conclusive ; and so the Court of Exchequer pronounced this very decree in chancery to be, and accorded to it the entire weight of *res judicata* ; and the same learned author, in his treatise on the Conflict of Laws, p. 515, remarking upon the doctrine of conclusiveness adopted by Holland, on the basis of reciprocity, seems to entirely approve of the doctrine upon that substantive ground, even were the authorities silent on the subject, and the matter, instead of being so often decided, were at this time, as I suppose, an open question. If, then, reciprocity be an additional reason, as it certainly is, there seems to be a very special fitness in regarding the present decrees as conclusive, seeing, 1st, the thoroughness of the present British doctrine, and how great would be the respect accorded by their courts to the decisions of our tribunals ; 2d, adverting also to the fact that the present controversy is solely between British subjects ; 3d, bearing also in mind that this is a question of British law, and of British chancery practice, and that the complainant, Aspden of London, after his five years' tarrying in chancery, and dismissal for want of proof, submitted to another tribunal of his own country the legal effect of that dismissal, which second tribunal pronounced it to be *res judicata*, and conclusive. On every principle, then, even of reciprocity and of comity, in addition to all the other reasons that have been urged, it is not doubted but that the Supreme Court will sustain those pleas in bar, and with the greater alacrity, as it may well be asked, *Cui bono* overrule them, as there is every moral certainty that it can only tend to another series of proofless delays ?

(4.) The dismissal of bills in equity in our own courts have often been held conclusive, as in the case of Holliday *v.* Coleman, 2 Munf. Rep. 162. In that case no evidence was exhibited on either side ; defendant demurred to complainant's bill, and also answered in detail ; the demurrer was sustained, and the bill dismissed. The complainant filed another bill, and the decree of dismissal was pleaded in bar. The court sustained the plea in bar, and said, — " A decree by a court of competent jurisdiction, dismissing a bill, is a complete bar to another original bill to try the same deed ; the proper remedy, if such decree be erroneous, being by appeal, writ of error, supersedeas, or bill of review.".

Again. In the case of the Bank of the United States *v.* Beverly, 1 Howard's S. C. Rep. 134, it was held, that " An answer in chancery, setting up as a defence the dismission of a former bill between the same parties, and for the same matter, is not sufficient, unless the record be exhibited." The conclusion from this non-production of the record must be, that, if the record be exhibited, the dismissal is conclusive. So likewise, in the case of Wright *v.* Diklyne, 1 Peters's C. C. Rep. 199, the court held, that " the dismission of a bill in chancery is not conclusive against the complainant in a court of law, but that in a court of equity such

dismissal would be a bar to a new bill " ; and the obvious reason is, because there are cases at law that will not be sustained in equity, and therefore the dismissal of a bill in equity could only be evidence that, as an equitable demand, it was not sustainable ; but where the decree of dismissal is defensively used in a court of equity, such dismissal is final and conclusive, and for the reverse reason, unless impugned on the ground of fraud. To the same effect is the case of McDowell *v.* McDowell, 1 Bailey's Eq. Rep. 324. "When a matter has once been adjudicated by a competent jurisdiction, it shall not again be drawn in question ; nor will parties be permitted again to litigate what they had once an opportunity of litigating ; and whatever might properly have been put in issue in that proceeding shall be concluded to be a thing determined." The cases of McClure *v.* Miller, Henderson *v.* Mitchell, and Marigarth *v.* Deas, 1 Bailey's Eq. Rep. 170, 113, 284, are all confirmatory, and strongly in point. Even upon a petition for a rehearing, if the party had knowledge of the evidence, or, by reasonable diligence or inquiry, might have obtained it, he will not be entitled to relief. Baker *v.* Whiting, 1 Story's Rep. 218 ; Heller *v.* Jones, 4 Binney, 60 ; Heimes *v.* Jacobs, 1 Penn. Rep. 152. Many hundred cases might be shown, all evincive of the determination of courts, as a fundamental rule of judicial policy and necessity, to sustain the vigilant, and to manifest no special favor, at least, to the grossly negligent. With what pretence of claim, then, can the Aspden family of London expect from this court the high and very special favor of litigating this case, which would not be retained a moment in the courts of their own country, after it could reach the chancellor's eye in judgment, and also when this court has a mountain of proof, that here, as well as there, they have played a part of most vexatious delay for nearly the fourth of a century ! In the language, then, of a distinguished American lawyer, Mr. Justice Kent, I will now conclude, taking to myself no little shame for the great length and the too immethodical character of the observations I have made on this case, — a case, I confess, that has greatly interested me, because of the shameful delays that have been produced by the London Aspens, — a case, too, in which no legal alchemy, even, could extract a scintilla of evidence of right on their part ! "Every person is bound," says Judge Kent, " to take care of his own rights, and to vindicate them in due season, and in proper order. This is a sound and salutary principle of law. Accordingly, if he neglects to use them, and suffers a recovery to be had against him by a competent tribunal, he is for ever precluded." " The general rule is intended to prevent litigation, and to preserve peace ; and were it otherwise, men would never know when they might repose with security on the decisions of courts of justice ; and judgments solemnly and deliberately given might cease to be revered, as being no longer the end

of controversy and the evidence of right." I Johns. Cases, 492, 502.

Mr. Justice CATRON (after having stated the facts of the case as they are recited in the commencement of this report) proceeded to deliver the opinion of the court.

We understand the true question submitted to this court to be, whether the decree dismissing the bill, made by the High Court of Chancery in England, bars and precludes John A. Brown, the Pennsylvania administrator of John Aspden of London, from prosecuting his claim as administrator for the Pennsylvania assets of the estate of Matthias Aspden, found in the hands of Joseph Trotter, the present administrator, with the will annexed ; Nixon having died, the contest in the British court was between an executor there, and administrators also there ; the complainants sued and the defendant resisted the claim alike in a representative capacity, and were restricted by the authority under which they respectively acted to the limits of the country to which their letters extended. Under his English letters testamentary, Nixon could do no act as executor beyond England ; so neither could he voluntarily transfer the Pennsylvania assets to the foreign jurisdiction, there to be distributed, as this would have been in violation of his letters in this country ; by these he held the assets here as trustee, and in subordination to the laws of Pennsylvania and the orders of the Orphan's Court executing those laws, as well as in subordination to the suit pending in the Circuit Court.

So, on the other hand, on the death of John Aspden of London, the bill in chancery ceased to be his bill, and became the suit of the parties for whose benefit it was revived ; when this was done, they represented John Aspden of London, as administrator of his estate, and the same rules applied to them as to Matthias's executor ; they only represented the intestate by virtue of, and to the extent of, their English letters, and could not be known as representatives in Pennsylvania. Again, the representative character of Nixon in England was altogether distinct from his character as executor in Pennsylvania. And so, also, the English administrators of John Aspden's estate are equally distinct from Brown, who is the administrator of his estate in Pennsylvania. It follows, the English suit was between different parties from those prosecuting and defending the American suit ; and therefore neither the decree, nor the proceedings on which it is founded, are competent evidence between the parties to the present suit, for this reason ; and yet more conclusively for another, which is, that the property in controversy here is distinct from that sued for in England.

As applicable to such a state of facts, the rules of evidence governing courts of justice are, that a judgment or decree set up as a bar by plea, or relied on as evidence by way of estoppel, to be con-

clusive, must have been made, 1. by a court of competent juris-
diction upon the same subject-matter ; 2. between the same par-
ties ; 3. for the same purpose ; and, on either ground, the evidence
submitted to our judgment is incompetent to prove any thing in
regard to the Pennsylvania assets.

But these conclusions are resisted by those setting up the bar on
this ground, — that the administration of the domicile is the principal
administration on the estate of Matthias Aspden, and this being in
England, and the assumed devisee's residence also being there, the
Pennsylvania administration was auxiliary to the foreign one ; that
in the British suit the American assets might have been recovered
from the executor Nixon, the bill having gone for the Pennsylvania
assets, as well as the English.

However true it may be, in cases peculiarly circumstanced, that
one jurisdiction administering assets may, as matter of comity,
transmit them to a foreign jurisdiction, there to be distributed ; still,
the doctrine can have no application here, as no assets had been
transmitted to England from Pennsylvania, and a suit was pending,
and in no part decided, in this country for the American assets, be-
fore and at the time the decree in England was made ; and there-
fore an assumption to distribute the assets in this country by the
High Court of Chancery in England must necessarily have been
treated by the Circuit Court as merely void for want of jurisdiction
of the subject-matter in the foreign court. Even up to this date,
the American court could exercise no comity, as is manifest from
the state of the proceedings before us ; nor will there be any occa-
sion for its exercise hereafter, as all the parties claiming the estate
are before the Circuit Court, anxiously litigating their claims, and
seeking distribution at its hands.

It is proper, however, to remark, in this connection, that the
courts of the United States held in Pennsylvania are administer-
ing the laws of that State, and bound by the same rules governing
the local tribunals; and that by these laws a devisee, before he can
take a legacy, must give security that if any debt or demand should
afterwards be recovered against the estate of the testator, the
devisee shall refund. Purdon's Dig., *Ex. & Ad.*, §§ 41, 47. So,
also, there are many other provisions in the laws of Pennsylvania
governing the distribution of estates that would embarrass the
Orphan's Courts in exercising the comity referred to. The like
laws exist in other States of the Union ; and, under the influence
of such laws, the courts of the States have been so much re-
strained, as to render an exercise of comity among each other
little more than a barren theory ; nor could more be required in a
case like the present, where part of the assets were administered
abroad, under independent letters granted there, and by a tribunal
that was under no obligations to extend comity to the probate courts

of this country, whatever might be done in the exercise of a sound discretion.

The next ground, and that relied on with most confidence in support of the bar, is, that John Aspden of London, and those representing him after his death, were British subjects, residing in Great Britain, and that the contest and only matter litigated in the High Court of Chancery was, whether John Aspden of London was or was not the heir and consequent devisee of Matthias Aspden; and that this fact having been found by the decree against the complainants established and concluded all proof to the contrary of such adjudication, directly on the single fact of title; and that the representatives of John of London could not be heard in another jurisdiction to disavow the conclusiveness of the finding by a court of their own government, to which they had resorted.

That the English bill involved directly the question of heirship, and that nothing else was contested, is undoubtedly true; but it is equally true, that no evidence was introduced by the complainants there to establish their title, nor was there had any adjudication on the merits of their claim; so that no equitable considerations are violated by our present judgment, in any aspect that the evidence may be viewed.

What effect the decree has in England is a question for the courts of that country to settle; nor will we now determine whether, in our judgment, by the comity of nations, the proceedings should have a similar effect here; or what effect they should have. The question for us to dispose of is, whether the administrator and distributees of John Aspden of London shall be heard in the Circuit Court, or whether their evidence of title is barred? We have already stated that the Pennsylvania assets stand unaffected, and will only add, that the assumption that a complainant or plaintiff is estopped, by a judgment against him, from introducing evidence in a second suit, and in another country, for other property, on the ground that the fact of title had been adjudged and concluded by a former judgment or decree (thus separating the title from the property), is an abstract proposition, inconsistent with the due administration of justice, and not recognized in our system of jurisprudence, or that of Great Britain, and is aside from any question affecting the comity of nations.

Giving the British decree all the force and effect that could be accorded to it if it had been made in a State of this Union, it yet establishes no fact, as respects any title to the Pennsylvania assets; nor would the rules of evidence be sufficient in separate suits, pending in the same court, for different parcels of property, even between the same parties. And therefore we certify to the Circuit Court, that the evidence introduced "touching the plea in bar" is no estoppel to the representatives of John Aspden of

London, in so far as they seek to recover the assets of Matthias Aspden's estate in the course of administration by the Orphan's Court of Philadelphia county. Further than this, we do not pretend to determine on the effect of the evidence, as we are not aware that any controversy now exists in the Circuit Court in regard to any other assets.

### *Order.*

This cause came on to be heard on the transcript of the record from the Circuit Court of the United States for the Eastern District of Pennsylvania, and on the point and question on which the judges of the said Circuit Court were opposed in opinion, and which was certified to this court for its opinion, agreeably to the act of Congress in such case made and provided, and was argued by counsel. On consideration whereof, it is the opinion of this court, that the evidence introduced " touching the plea in bar " is no estoppel to the representatives of John Aspden of London, in so far as they seek to recover the assets of Matthias Aspden's estate in the course of administration by the Orphan's Court of Philadelphia county ; whereupon it is now here ordered and decreed by this court, that it be certified to the said Circuit Court accordingly.

Dissenting, Mr. Chief Justice TANEY and Mr. Justice McLEAN.