(89 South. 376)

## CRIM v. LOUISVILLE & N. R. R. CO. (5 Div. 745.)

(Supreme Court of Alabama. Jan. 13, 1921. Rehearing Denied May 19, 1921.)

**1. Railroads ☜5½, New, vol. 6A Key-No. Series — Substitution of Director General in pending suit optional.**

Where a suit against a railroad corporation for injuries occasioned while the railroad was under federal control had been brought, as authorized by the Federal Control Act (U. S. Comp. St. 1918, U. S. Comp. St. Ann. Supp.

1919, §§ 3115¾a–3115¾p) before the Director General issued his General Order No. 50, requiring such actions to be brought against him, the substitution of the Director General as defendant in such action was optional with the plaintiff and not mandatory, so that the general charge for defendant could not be sustained on the ground that the evidence showed the liability was that of the Director General, and not of the defendant corporation.

2. **Railroads ⚹5½, New, vol. 6A Key-No. Series—Judgment against Director General in suit under his order will be sustained.**

Even though the Federal Control Act (U. S. Comp. St. 1918, U. S. Comp. St. Ann. Supp. 1919, §§ 3115¾a–3115¾p) permits suits to be brought against railroad corporations for injuries occasioned while they were under federal control, a judgment rendered against the Director General of Railroads in a suit in which he was made defendant, as provided by his General Order No. 50, and in which he made no objection to the maintenance of the suit against him, will not be reversed.

3. **Master and servant ⚹279(1) — Evidence held insufficient to sustain recovery against railroad for killing of employee by insane fellow employee.**

In an action for the death of a railroad train dispatcher, who was killed by an insane fellow dispatcher, evidence which failed to show that either deceased or the insane fellow dispatcher were employed in interstate commerce at the time, or that the railroad company had any reason to believe the insane dispatcher was dangerous, though it did know he was mentally deranged and had instructed deceased to look after him, *held* insufficient to sustain a recovery either under the Federal Employers' Liability Act (U. S. Comp. St. §§ 8657–8665) or under the master's liability at common law for the maintenance of a dangerous agency on its premises.

Brown, J., dissenting as to result.

Appeal from Circuit Court, Chilton County; Leon McCord, Judge.

Action by Sarah Crim, as administratrix of the estate of her deceased husband, against the Louisville & Nashville Railroad Company for damages for the death of her intestate. Judgment for the defendant, and plaintiff appeals. Affirmed.

Crim, the intestate, and Parrish were dispatchers on the Louisville & Nashville Railroad at a point in Chilton, which was an order point handling orders for intrastate and interstate trains, each working his separate trick. Parrish became ill, and suffered from delusions at times, and at other times was apparently all right, and attended to his duties as usual. There was evidence tending to show that these facts were known to their superior officers, and that one of such officers had directed that Parrish be looked after by the others in the employ of the railroad company. Soon after Crim had

gone to work the wife of Parrish came to the office, and said something was wrong at the house, and asked Crim to go with her to see about it. He left the office, and as he approached the house was shot and killed; it appearing that Parrish did the shooting.

Count 8 of the complaint is as follows:

"Plaintiff who sues as administratrix of the estate of Herbert Crim, deceased, claims of the defendant $100,000 damages, for that, on, to wit, February 8, 1918, plaintiff's intestate, while in the employment of defendant, and while upon the premises of the defendant at a place where he had the right to be, and was not a trespasser, was shot to death as follows: The defendant at said time allowed to remain upon the premises aforesaid one Grady Parrish, a man whom it knew to be of unsound mind, an idiot, a lunatic, liable to become violent at any time, and said lunatic, while retained upon said premises by the defendant, did become violent, and did shoot to death with a shotgun said intestate, Herbert Crim, on the date aforesaid. Plaintiff avers at the time of the occurrence of all of the matters and things herein complained of the defendant was a common carrier by railroad, and engaged in the carriage of freight and passengers for hire between the states of Louisiana, Alabama, and Tennessee, and intestate was then and there employed by the defendant in said commerce. Plaintiff avers the death of her intestate resulted in whole or in part from the negligence of the officers, agents, or employees of the defendant, or by reason of a defect or insufficiency, due to its negligence, in its cars, engines, appliances, machinery, track, roadbed, works, boats, wharves, or other equipment."

James K. Barton and W. A. Denson, both of Birmingham, for appellant.

Count 8 was proven, and the court erred in taking the same from the jury. 194 Ala. 175, 69 South. 601; 195 Ala. 152, 69 South. 965; 194 Ala. 338, 70 South. 9; 196 Ala. 136, 72 South. 69; 196 Ala. 670, 72 South. 307; 197 Ala. 367, 72 South. 642; 73 South. 5; 198 Ala. 288, 73 South. 501; 75 South. 23; 75 South. 146; 201 Ala. 3, 75 South. 289; 200 Ala. 600, 76 South. 959; 201 Ala. 129, 77 South. 553; 201 Ala. 336, 77 South. 998; 142 La. 927, 78 South. 852; 201 Ala. 582, 79 South. 6; 201 Ala. 589, 79 South. 11; 80 South. 404; 203 Ala. 284, 82 South. 539; 203 Ala. 296, 82 South. 549. Crim was still on duty and engaged in interstate commerce. 232 U. S. 248, 34 Sup. Ct. 305, 58 L. Ed. 591, Ann. Cas. 1914C, 159; 90 N. J. Law, 529, 101 Atl. 203; 244 U. S. 179, 37 Sup. Ct. 558, 61 L. Ed. 1066; 143 Ala. 603, 42 South. 73, 5 Ann. Cas. 709; 234 Fed. 9, 148 C. C. A. 17, 25; 162 Ky. 209, 172 S. W. 517. Parrish was also an employee engaged in interstate commerce, if that is essential to be shown. 81 S. E. 283; 246 U. S. 253, 38 Sup. Ct. 233, 62 L. Ed. 699; 241 U. S. 470, 36 Sup. Ct. 624, 60 L. Ed. 1107; 241 U. S. 33, 36 Sup. Ct. 482; 60 L. Ed. 874.

⚹For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

Lawrence F. Gerald, of Clanton, and Jones, Thomas & Jones, of Montgomery, for appellee.

No cause of action is shown by the evidence. 111 Ark. 337, 164 S. W. 286; 158 Ky. 121, 164 S. W. 335, 50 L. R. A. (N. S.) 1104, Ann. Cas. 1915D, 223; 3 C. J. 89; 114 Ala. 290, 21 South. 965; 22 Ala. 568; 7 Ala. 169. The allegations of count 8 did not bring it within the federal statute. 195 Ala. 382, 70 South. 655, Ann. Cas. 1917E, 292; 29 Tex. Civ. App. 489, 68 S. W. 528; 71 South. 685; 65 Kan. 390, 69 Pac. 338, 58 L. R. A. 399.

THOMAS, J. The suit filed August 19, 1918, was by a personal representative for the death of plaintiff's intestate from injury inflicted on February 8, 1918, while discharging his duties as telegraph operator in an office of the transportation department of the Louisville & Nashville Railroad Company.

The judgment entry of date of February 12, 1919, recites that—

"Walker D. Hines, as Director General of Railroads, is substituted for Louisville & Nashville Railroad Company, and notice is ordered issued to Walker D. Hines that he has been substituted as defendant in this cause, and this cause is continued by the defendant."

The judgment of October 14, 1919, recites the striking out the Director General of Railroads as a party defendant against that official's and defendant corporation's due objections and exceptions and the overruling of defendant's several motions to make the Director General a party defendant.

A question for decision concerns the failure of plaintiff to show liability of the sole defendant, and the general affirmative charge given at its request in writing. A. had sued B., and C. was made a party defendant; against the objection of defendant, plaintiff dismissed the suit as to C. After full pleading and proof, the evidence failed to show the liability of B., but that of C.; hence the affirmative charge and the appeal by plaintiff.

As preliminary observations we may say: (1) That there was no cross-appeal and assignment of error by defendant, in whose favor the judgment was rendered; and the question presented is not an attempt to invoke error by appellee without cross-assignment of error for preliminary ruling against it at the trial. Holdsombeck v. Fancher, 112 Ala. 469, 20 South. 519; McLendon v. Stephens, 124 Ala. 505, 508, 26 South. 921; Long v. Campbell, 133 Ala. 353, 32 South. 591. (2) The fact that the party responsible for the death of plaintiff's intestate was originally a party defendant and stricken on plaintiff's motion will not avail appellant, since plaintiff (appellant) invoked the court to the exclusion of the sole party defendant who was guilty of the damnifying act on which the

suit rested. Having invoked the court to error by an amendment he could not prove, he must suffer for this error. Talley v. Whitlock, 199 Ala. 28, 73 South. 976; B. R., L. & P. Co. v. Hunt, 200 Ala. 560, 76 South. 918. (3) Nor is this case controlled by the line of cases which hold the lessor of a railroad liable for the negligence of the lessee, since the operation and control of the transportation in question was by operation of law, and not by way of contract. The case made by the instant record and evidence is that, by operation of law the Louisville & Nashville Railroad Company, a corporation, having had its transportation properties (personal and real) taken over by the United States government on or about January 1, 1918, and since then been operated by its Director General of Railroads, while having been so used and operated by the government, primarily in the transportation of troops and munitions of war, its agent (while engaged in the discharge of the duties of his employment by the government) wrongfully killed plaintiff's intestate by shooting him (a co-employee of the government) on February 8, 1918, without fault on the part of defendant corporation or any person for whose acts it was responsible.

Authority would appear to be unnecessary. However, in an action for damages from an improper construction of a railroad culvert, where it appeared that one of the defendants had nothing to do with its construction, the affirmative charge in favor of defendants was justified in the giving (Watts v. A. B. & A. R. R. Co., 179 Ala. 436, 443, 60 South. 861); and in an action for maintaining a nuisance a verdict was held properly directed for defendants as to a count under which there was no proof to sustain an averment that defendants were in control of and operating the sewerage plant of which complaint was made. Murkerson v. Adler, 178 Ala. 622, 625, 59 South. 505. It would appear unnecessary to cite authorities to justify the giving of the affirmative charge for the failure of the evidence to support counts of the complaint held to justify its giving. L. & N. R. R. Co. v. Perkins, 152 Ala. 133, 44 South. 602; L. & N. R. R. Co. v. Davis, 91 Ala. 487, 8 South. 552; Merrill v. Smith, 158 Ala. 186, 48 South. 495; Gulf City Const. Co. v. L. & N. R. R. Co., 121 Ala. 621, 25 South. 579; Tobler v. Pioneer, etc., Co., 166 Ala. 482, 52 South. 86; Hatch v. Varner, 150 Ala. 440, 43 South. 481. Where plaintiff wholly failed to prove material averments of the complaint to which there was a plea of the general issue, defendant is entitled to the general affirmative charge. Alexander v. Woodmen of the World, 161 Ala. 561, 49 South. 883; Crutcher v. Memphis, etc., Co., 38 Ala. 579; 12 Ency. Dig. Ala. Rep. p. 398, § 132.

The insistence of appellee is that there was no error in giving the general affirma-

tive charge for the defendant, conceding that the evidence was sufficient to show a cause of action, because the right of action was against Walker D. Hines as Director General of Railroads, and not against the Louisville & Nashville Railroad Company, a corporation being operated by the government at the time of the injury and death of plaintiff's intestate, and because the evidence introduced was insufficient to show a cause of action. What, then, was the authority to maintain a suit under the instant pleading and proof by and against a railroad corporation, the properties of which were being operated by the general government by operation of law? Said suit is founded on a breach of duty arising from and affecting the rights and liabilities of such operation under authority of law—the federal statutes, the proclamations of the President, and said General Orders of the Directors General of Railroads.

Appropriate federal statutes are: Acts of Congress of June 29, 1906, 34 St. pp. 584, 587, § 2 (U. S. Comp. St. § 8569) (24 U. S. Stat. L. c. 104, p. 379; 39 Stat. L. c. 417, pp. 556, 604); Act of Congress August 29, 1916 (U. S. Comp. St. § 1974a); Act of Congress March 21, 1918 (U. S. Comp. St. 1918, U. S. Comp. St. Ann. Supp. 1919, §§ 3115¾ac, 3115¾e, 3115¾f, 3115¾j); proclamations of the President of dates of December 26, 1917, and April 11, 1918 (U. S. Comp. St. 1918, pp. 274, 275); and General Orders of the Directors General of Railroads (No. 50, issued October 28, 1918, and No. 50-A, issued January 11, 1919) pertaining to the operation of railroads under federal control. We take judicial knowledge of said General Orders, the fact that respective contracts for compensation and for liability were made by and pursuant to the obligations of law by the Directors General with transportation systems operated under federal control, which were a necessary condition of such operation by the government, and that the government had control of and was operating the transportation properties of the Louisville & Nashville Railroad Company before and at the time of the injury and death of plaintiff's intestate by operation of law, and subject to contract for compensation and liability by obligation of law. Lawrenceburg Roller Mills Co. v. Jones, 204 Ala. 59, 85 South. 719; Webb v. White Eng. Corp., 204 Ala. 429, 85 South. 729; Ex parte Vaughn, 203 Ala. 700, 82 South. 894; Vaughn v. State, 17 Ala. App. 35, 81 South. 417; McDougal v. L. & N. R. R. Co., 17 Ala. App. 468, 85 South. 880; W. U. T. Co. v. Glover, 17 Ala. App. 374, 86 South. 154. The General Orders of William G. McAdoo, as Director General of Railroads, from 1 to 43, inclusive, are to be found as an appendix to 2 Roberts Federal Liabilities of Carriers, and Nos. 50 and 50-A are set out in Vaughn v. State, supra, pp. 424, 425. Facts judicially known

need not be pleaded. Perryman v. Greenville, 51 Ala. 507.

The power of Congress to take over physical control and operation of transportation properties in this country during the war, and to provide and make compensation therefor and assume liability therein, is found in article 1, § 8, cl. 3, of the federal Constitution, vesting the power "To regulate commerce with foreign nations, and among the several states, and with the Indian Tribes" (Gibbons v. Ogden, 9 Wheat. 1, 6 L. Ed. 23; Pensacola Tel. Co. v. West, etc., T. Co., 96 U. S. 1, 8, 24 L. Ed. 708; Chicago & N. W. R. Co. v. Fuller, 17 Wall. 560, 568, 21 L. Ed. 710; Inter. Com. Comm. v. Goodrich Transit Co., 224 U. S. 194, 32 Sup. Ct. 436, 56 L. Ed. 729; Reid v. Colorado, 187 U. S. 137, 139, 147, 23 Sup. Ct. 92, 47 L. Ed. 108; Addyston Pipe & Steel Co. v. United States, 175 U. S. 211, 241, 242, 20 Sup. Ct. 96, 44 L. Ed. 136), rather than in the taxing power to "provide for the common defense and general welfare of the United States" (article 1, § 8, cl. 1, Const. U. S.; United States v. Boyer [D. C.] 85 Fed. 425; Story's Const. §§ 907, 908).

The regulatory power was given expression by Congress in the "Interstate Commerce Act" entitled "An Act to Regulate Commerce," approved February 4, 1887 (24 U. S. Stat. L. c. 104, pp. 379–387), and the amendment thereto of June 29, 1906 (34 U. S. Stat. L. c. 3591, § 2, pp. 584, 587 [U. S. Comp. St. § 8569]) as follows:

"That in time of war or threatened war preference and precedence shall, upon the demand of the President of the United States, be given, over all other traffic, to the transportation of troops and material of war, and carriers shall adopt every means within their control to facilitate and expedite the military traffic"

—and in the Naval Appropriation Act approved August 29, 1916 (39 U. S. Stat. L. c. 417, pp. 556, 604), is contained a like provision, with the further duty added by Congress:

"And in time of peace shipments consigned to agents of the United States for its use shall be delivered by the carriers as promptly as possible and without regard to any embargo that may have been declared, and no such embargo shall apply to shipments so consigned." U. S. Comp. St. § 8569.

In the Army Appropriation Act of August 29, 1916, it was provided by Congress that—

"The President, in time of war is empowered, through the Secretary of War, to take possession and assume control of any system or systems of transportation, or any part thereof, and to utilize the same, to the exclusion as far as may be necessary of all other traffic thereon, for the transfer or transportation of troops, war material and equipment, or for such other purposes connected with the emergency as may be needful or desirable." 39 U. S. Stat. L. 645 (U. S. Comp. St. § 1974a).

The proclamation of the President thereunder, of date December 26, 1917, recited the necessity for his action in taking over and operating the transportation systems of the United States; ordered the taking of the transportation systems of the United States for federal control; and directed that—

The "possession, control, operation and utilization of such transportation systems hereby by me undertaken shall be exercised by and through William G. McAdoo, who is hereby appointed and designated Director General of Railroads. * * * Except with the prior written assent of said Director, no attachment by mesne process or on execution shall be levied on or against any of the property used by any of the said transportation systems in the conduct of their business as common carriers; but suits may be brought by and against said carriers and judgments rendered as hitherto until and except so far as said Director may, by general or special orders, otherwise determine."

The additional proclamation of April 11, 1918, was to like effect. U. S. Comp. St. 1918 (Comp. Ed.) § 1974a, p. 274.

Congress then passed what is called the "Federal Controlled Transportation System" Act, approved March 21, 1918, providing for agreements as to compensation; operating income; war taxes; maintenance; claims for compensation and for its increase; payment of dividends; revolving fund; additions and betterments; for payment of maturing obligations (sections 1–7); provided that the President may execute any of the powers herein and heretofore granted with relation to federal control through such agencies as he may determine (section 8); that the provisions of Act Aug. 29, 1916, chapter 418, "shall remain in force and effect except as expressly modified and restricted by this act"; and the President, in addition to the powers conferred by this act, shall have, and is hereby given, such other and further powers necessary or appropriate to give effect to the powers herein and heretofore conferred. The provisions of this act shall also apply to any carriers to which federal control may be hereafter extended (section 9); that while under federal control such carriers "shall be subject to all laws and liabilities as common carriers, whether arising under state or federal laws or at common law, except in so far as may be inconsistent with the provisions of this act or any other act applicable to such federal control or with any order of the President. Actions at law or suits in equity may be brought by and against such carriers and judgments rendered as now provided by law; and in any action at law or suit in equity against the carrier, no defense shall be made thereto upon the ground that the carrier is an instrumentality or agency of the federal government. Nor shall any such carrier be entitled to have transferred to a federal court any action heretofore or hereafter instituted by or against it, which action was not so trans-

ferable prior to the federal control of such carrier; and any action which has heretofore been so transferred because of such federal control or of any act of Congress or official order or proclamation relating thereto shall upon motion of either party be transferred to the court in which it was originally instituted. But no process, mesne or final, shall be levied against any property under such federal control. During the period of federal control, whenever in his opinion the public interest requires, the President may initiate rates, fares, charges, classifications, regulations, and practices by filing the same with the Interstate Commerce Commission, which said rates, fares, charges, classifications, regulations, and practices shall not be suspended by the Commission pending final determination" (section 10); that property derived from the operation of the carriers during federal control is declared to be the property of the United States (section 12); and that pending cases in courts of the United States affecting railroads or other transportation systems, etc., against carriers may proceed to judgment, the court having jurisdiction being given the right to stay execution of final judgment or · decree until such time as is deemed proper (section 13); that the time of federal control shall continue for and during the period of the war and for a reasonable time thereafter, which shall not exceed the time limit fixed, giving the President the right, prior to July 1, 1918, to relinquish control of all or any part of any railroad or system of transportation, if he deems such action needful or desirable (section 14); that nothing in the act shall be construed to amend, repeal, impair, or affect the existing laws or powers of the states in relation to taxation or the lawful police regulations of the several states, except wherein such laws, powers or regulations may affect the transportation of troops, war materials, government supplies, or the issue of stocks and bonds (section 15); and the act "is expressly declared to be emergency legislation enacted to meet conditions growing out of the war; and nothing herein is to be construed as expressing or prejudicing the future policy of the federal government concerning the ownership, control, or regulation of carriers or the method or basis of the capitalization thereof" (section 16). U. S. Comp. St. 1918 (U. S. Comp. St. Ann. Supp. 1919, §§ 3115¾a–3115¾p).

After the passage of this act, the President (March 29, 1918) issued a proclamation, authorizing Wm. G. McAdoo, Director General of Railroads as aforesaid, either personally or in the name of the President, to exercise all of the powers conferred by the President, and to "issue any and all orders which may in any way be found necessary and expedient in connection with the federal control of systems of transportation, railroads, and inland waterways as fully. in all respects as

the President is authorized to do, and generally to do and perform all and singular all acts and things and to exercise all and singular the powers and duties which in and by the said act, or any other act in relation to the subject hereof, the President is authorized to do and perform." Section 3115¾h, U. S. Comp. St. 1918, U. S. Comp. St. Ann. Supp. 1919. And on October 28, 1918, W. G. McAdoo, as the Director General in the administration of such federal control, issued his General Order No. 50, whereby, so far as is here pertinent, it was provided that:

"Whereas by the proclamations dated December 26, 1917, and April 11, 1918, the President took possession and assumed control of systems of transportation and the appurtenances thereof, and appointed the undersigned, William G. McAdoo, Director General of Railroads, and provided in and by said proclamations that 'until and except so far as said Director shall from time to time otherwise by general or special orders determine, such systems of transportation shall remain subject to all existing statutes and orders of the Interstate Commerce Commission and to all statutes, * * * but any orders, general or special, hereafter made by said Director shall have paramount authority and be obeyed as such'; and

"Whereas the act of Congress, called the Federal Control Act, approved March 21, 1918, provided that 'Carriers while under federal control shall be subject to all laws and liabilities as common carriers, whether arising under state or federal laws or at common law, except in so far as may be inconsistent with the provisions of this act or any other act applicable to such federal control, or with any order of the President'; and

"Whereas since the Director General assumed control of said systems of transportation, suits are being brought and judgments and decrees rendered against carrier corporations on matters based on causes of action arising during federal control for which the said carrier corporations are not responsible, and it is right and proper that the actions, suits and proceedings hereinafter referred to, based on causes of action arising during or out of federal control, should be brought directly against the said Director General of Railroads and not against said corporations:

"It is therefore ordered, that actions at law, suits in equity, and proceedings in admiralty hereafter brought in any court, based on contract, binding upon the Director General of Railroads, claim for death or injury to person, or for loss and damage to property, arising since December 31, 1917, and growing out of the possession, use, control or operation of any railroad or system of transportation by the Director General of Railroads, which action, suit, or proceeding but for federal control might have been brought against the carrier company, shall be brought against William G. McAdoo, Director General of Railroads, and not otherwise; provided, however, that this order shall not apply to actions, suits, or proceedings for the recovery of fines, penalties, and forfeitures. * * *

"The pleadings in all such actions at law, suits in equity, or proceedings in admiralty, now pending against any carrier company for a cause of action arising since December 31, 1917, based on a cause of action arising from or out of the operation of any railroad or other carrier, may on application be amended by substituting the Director General of Railroads for the carrier company as party defendant and dismissing the company therefrom."

Mr. McAdoo, having resigned said office, and his successor having been appointed by the President, the provisions of General Order A were embodied in General Order 50–A by such Director General, Walker D. Hines (January 11, 1919) reading as follows:

"It is therefore ordered that actions at law, suits in equity, and proceedings in admiralty hereafter brought in any court based on contract, binding upon the Director General of Railroads, claim for death or injury to person, or for loss and damage to property, arising since December 31, 1917, and growing out of the possession, use, control or operation of any railroad or system of transportation by the Director General of Railroads, which action, suit, or proceedings but for federal control might have been brought against the carrier company, shall be brought against the Director General of Railroads, and not otherwise; provided, however, that this order shall not apply to actions, suits, or proceedings for the recovery of fines, penalties, and forfeitures.

"Subject to the provisions of General Orders Nos. 18, 18–A and 26 [declaring venue of certain actions to be where the plaintiff resides at the time of the accrual of the cause of action, or in the county or district where the cause of action arose, and for the staying of the action during federal control on proper application therefor. Rhodes v. Tatum (Tex. Civ. App.) 206 S. W. 114; Wainwright v. Pennsylvania R. Co. (D. C.) 253 Fed. 459], heretofore issued by the Director General of Railroads, service of process in any such action, suit or proceeding may be made upon operating officials operating for the Director General of Railroads, the railroad or other carrier in respect of which the cause of action arises in the same way as service was heretofore made upon like operating officials for such railroad or other carrier company.

"The pleadings in all such actions at law, suits in equity, or proceedings in admiralty, now pending against any carrier company for a cause of action arising since December 31, 1917, based upon a cause of action arising from or out of the operation of any railroad or other carrier, may on application be amended by substituting the Director General of Railroads for the carrier company as party defendant and dismissing the company therefrom." General Order No. 50–A.

In explanation of the purpose of the order and its effect upon litigation, the Director General stated to the Interstate Commerce Committee of the United States Senate in April, 1919:

"General Order No. 50 is designed to deal with certain classes of causes of action that arise against the government while the govern-

ment is in control of the railroads—causes of action for which the government is liable and for which the corporation is not liable. Claims were beginning to be made in various parts of the country that the corporation itself was not liable for a cause of action arising against the government while it was in control, and plaintiffs were being embarrassed because they were not certain where they were going to come out if they sued the corporation. It seemed a reasonable rule, and really in the interests of plaintiffs—and it did not have any relation to anything else or cause any disturbing factors—to provide that where these causes of action arose against the government, in effect that suits should be brought against the Director General. It still left the plaintiffs free to sue just as they could sue before, and to make service of process on the local railroad agents just as they could make it before."

That the Director General of Railroads entered into agreements for compensation with transportation systems operated by the government is of common knowledge, and that such contract was made with the Louisville & Nashville Railroad Company.

Provisions of General Orders Nos. 50 and 50-a partook somewhat of the nature of the exercise of a legislative discretion rightly conferred by Congress, and not of a legislative power in excess of the power of Congress. Not every such delegation of power will be held to transgress the provisions of the Constitution defining the limitations between legislative and executive departments of government. Congress had clearly defined the purpose to be accomplished by the several enactments and the giving, to the President and executive officers so designated by him, of power to make such needful and proper regulations for carrying out the purpose of the acts authorizing federal control of transportation systems, as their judgment of a federal controlled transportation system should dictate to be a needful act and facility of its prosecution of the necessity of war, and such regulations have been uniformly held as administrative though having "the force and effect" of a "legislative discretion." U. S. v. Grimaud, 220 U. S. 506, 31 Sup. Ct. 480, 55 L. Ed. 563, on indictment of grazing sheep contrary to rule of the Secretary of Agriculture; Buttfield v. Stranahan, 192 U. S. 470, 24 Sup. Ct. 349, 48 L. Ed. 525, decision by Board of Tea Inspectors and the Secretary of the Interior on examination of samples of tea; Field v. Clark, 143 U. S. 649, 694, 12 Sup. Ct. 495, 36 L. Ed. 294, of the power conferred upon the President to reduce the revenues and equalize duties on imports; Arver v. U. S., 245 U. S. 366, 389, 38 Sup. Ct. 159, 62 L. Ed. 349, L. R. A. 1918C, 361, Ann. Cas. 1918B, 856.

In Field v. Clark, supra, it is said:

"The Legislature cannot delegate its power to make a law; but it can make a law to delegate a power to determine some fact or state of things upon which the law makes, or intends

to make, its own action depend. To deny this would be to stop the wheels of government. There are many things upon which wise and useful legislation must depend which cannot be known to the law-making power, and must therefore be a subject of inquiry and determination outside of the halls of legislation.

"What has been said is equally applicable to the objection that the third section of the act invests the President with treaty-making power.

"The court is of opinion that the third section of the act of October 1, 1890, is not liable to the objection that it transfers legislative and treaty-making power to the President."

And in Arver v. U. S. (Selective Draft Cases), where very extended powers were conferred upon the executive, answering a similar objection, through Mr. Chief Justice White, the court said:

"We think that the contention that the statute is void because vesting administrative officers with legislative discretion has been so completely adversely settled as to require reference only to some of the decided cases. Field v. Clark, 143 U. S. 649; Buttfield v. Stranahan, 192 U. S. 470; Intermountain Rate Cases, 234 U. S. 476 [the power of Interstate Commerce Commission to permit lower rates for the longer haul] [34 Sup. Ct. 986, 58 L. Ed. 1408]; First National Bank v. Union Trust Co., 244 U. S. 416 [37 Sup. Ct. 734, 61 L. Ed. 1233, L. R. A. 1918C, 283, Ann. Cas. 1918D, 1169]," the right of Federal Reserve Board to grant special permit, not in contravention of state or local law, the right to act as trustee, etc.

It was in construction of the clause of the statute authorizing the President to initiate rates, fares, charges, classifications, regulations and practices by filing the same with the Interstate Commerce Commission that Northern Pac. Ry. Co. v. State of N. Dakota, 250 U. S. 135, 148, 39 Sup. Ct. 502, 505, 63 L. Ed. 897, was decided upholding the President's power to make rates. For this, however, the act of Congress expressly provided. The application by the state, on relation of its Attorney General, was for writ of mandamus against the "Northern Pacific Railway Company and Walker D. Hines, as Director General of Railroads." The Chief Justice said:

"No elaboration could make clearer than do the act of Congress of 1916 the proclamation of the President exerting the powers given, and the act of 1918 dealing with the situation created by the exercise of such authority, that no divided but a complete possession and control were given the United States for all purposes as to the railroads in question. But if it be conceded that despite the absolute clarity of the provisions concerning the control given the United States, and the all-embracing scope of that control, there is room for some doubt, the consideration of the general context completely dispels hesitance. How can any other conclusion be reached if consideration be given the comprehensive provisions concerning the administration by the United States of the property which it was authorized to take, the

financial obligations under which it came and all the other duties and exactions which the act imposed, contemplating one control, one administration, one power for the accomplishment of the one purpose, the complete possession by governmental authority to replace for the period provided the private ownership theretofore existing? This being true, it must follow that there is no basis for the contention that the power to make rates and enforce them, which was plainly essential to the authority given, was not included in it."

The references here made were to the act of August 29, 1916; the proclamations of the President of December 26, 1917, and April 11, 1918; and to the act of March 21, 1918.

The case of Vaughn v. State, supra, deciding that the ownership in its personal properties in the railroad being taken over and operated by the federal government, was such as to support a charge of larceny, where the ownership of the properties feloniously taken was laid in the railroad, and not in the United States or its Director General operating such railroad. That the ownership of property embezzled may be laid in the United States was declared in United States v. Kambeitz (D. C.) 256 Fed. 247, 258. The Vaughn Case was discussed in Hatcher & Snyder v. A., T. & S. F. Ry. Co. (D. C.) 258 Fed. 952, where, under the construction of section 10 of the act of Congress contended for, the motion to substitute as the sole defendant the Director General of Railroads and to dismiss as to the railway company was denied, since the plaintiffs had signified consent to the Director General of Railroads coming in as a codefendant.

In the case of Nash v. So. Pac. Co. (D. C.) 260 Fed. 280, on motion for substitution of defendants, intervention by Walker D. Hines as Director General of Railroads, it was urged, notwithstanding the averment of his complaint to the contrary, the fact was not controverted "that defendant's entire railroad and transportation system was taken over at the date indicated in the moving papers, and has since been operated exclusively under federal control." The validity of General Order No. 50 was challenged by the plaintiff as an attempted exertion of power outside the legitimate limits of the authority intended to be vested in the executive by the legislation in question, and as being beyond the power of Congress to so delegate; that it involved a purely legislative function of prescribing rules of practice and procedure in legal actions and proceedings, exclusively within the power of Congress; that the order is in direct conflict with section 10 of the Federal Control Act, which (it was asserted) expressly authorized the maintenance of the action against the present defendant. The District Court held:

"General Order No. 50 of the Director General of Railroads, in requiring all actions and suits on claims for death or injury to person, or loss or damage to property, growing out of the possession, use, control or operation of any railroad by the Director General of Railroads, which might, but for federal control, have been brought against the carrier company, to be brought against the Director General, is within the authority lawfully conferred on the President by Federal Control Act March 21, 1918 (U. S. Comp. St. 1918, U. S. Comp. St. Ann. Supp. 1919, §§ 3115¾a–3115¾p), and is not inconsistent with section 10 of said act"

—and that:

Under said order "in an action against a railroad company for an injury alleged to have been caused by negligent operation while the road was under federal control, the Director General will, on his motion, be substituted as defendant, and the company be dismissed therefrom." Rutherford v. Union Pacific R. Co. (D. C.) 254 Fed. 880; Dahn v. McAdoo, Dr. Gen. of Rds. (D. C.) 256 Fed. 549; Mardis v. Hines (D. C.) 258 Fed. 945; Peacock v. Detroit, G. H. & M. Ry. Co., 208 Mich. 403, 175 N. W. 580, 8 A. L. R. 964; Sagona v. Pullman Co. (Sup.) 174 N. Y. Supp. 536; Castle v. Sou. Ry., 112 S. C. 407, 99 S. E. 846.

In Wainwright v. Pennsylvania R. Co. (D. C.) 253 Fed. 459, 461, 464, answering the inquiry whether Congress granted the power to the President for fixing venue of actions as being within the war power of Congress, it is said:

"In McCulloch v. Maryland, 17 U. S. (4 Wheat.) 316, 421 (4 L. Ed. 579), Chief Justice Marshall delivering the opinion of the court, it was held as a proper canon of the interpretation of the powers of Congress under the National Constitution, among others:

" 'Let the end be legitimate, let it be within the scope of the Constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consist with the letter and spirit of the Constitution, are constitutional.' This rule of construction has never been doubted or questioned by any subsequent decision, but has been uniformly followed, whenever it has been before the courts, and must therefore be accepted as elementary in the construction of the National Constitution. That there is nothing in the Constitution prohibiting Congress from determining the venue in civil actions is beyond question. * * *

"Counsel for plaintiff contend that it does not, relying upon that part of section 10 of the act, which reads: 'Actions at law or suits in equity may be brought by and against such carriers and judgments rendered as now provided by law.' In the opinion of the court all this quotation means is that any person having a cause of action shall not, by reason of this act or any regulation made thereunder, be deprived of the right to maintain it in a proper court, if, under the state, federal, or common law, he is entitled to a legal remedy. It does not mean, as claimed, that, having a cause of action against the carrier, he has the right to institute it in any forum in which he could have brought it before the passage of this act."

The decision in Westbrook v. Director General of Railroads (D. C.) 263 Fed. 211, 217, concludes with the following:

"General Orders 50 and 50a are a full recognition by the Director General of the government's liability to be sued, as above pointed out, but should not be considered the authority for it. While great power was given him, so great an one as that of subjecting the United States to suits at his will and prescribing the form of procedure ought not rashly to be conceded to any official. Carr v. United States, 98 U. S. 433, 434, 25 L. Ed. 209; Stanley v. Schwalby, 162 U. S. 255, 16 Sup. Ct. 754, 40 L. Ed. 960. The orders really deal only with a matter of name, in an effort to avoid the confusion arising from the practice which before obtained of suing the United States under the names of the several owning companies, which names were used by the government in accounting and in operating their lines of transportation. These orders, in directing amendments to pending suits for causes arising since federal control, did not seek to substitute either a new liability or a new party, but merely gave the United States another and less misleading name. The provisions of section 10 will not be held intended to apply to the owning companies, because, so applied, the legislation would be not only unreasonable, but probably unconstitutional. Taken to mean the government in its operation of the several railroads, it is intelligible, within the powers of Congress, accomplishes justice and the apparent intention of Congress, and accords with the executive construction of the Director General in the contracts made with the companies for their compensation, wherein he assumed all such liabilities, as well as in his orders, of which 50 and 50a are examples."

See Spring v. American, etc., Co. (W. Va.) 103 S. E. 206, 10 A. L. R. 951, notes; Castle v. South. R. Co., 112 S. C. 407, 99 S. E. 846, 8 A. L. R. 959, and authorities collected in my concurrence to L. & N. v. Heidtmueller, ante, p. 29, 89 South. 191.

Some Supreme Courts of states have held that in so far as such General Order of the Director General sought to prohibit the maintenance of an action against the railroad company, it is in conflict with the act of Congress of March 21, 1918, section 10. Lavalle v. North. Pac. Ry. Co., 143 Minn. 74, 172 N. W. 918, 4 A. L. R. 1659; McGregor v. Great Northern Ry. Co. (N. D.) 172 N. W. 841, 4 A. L. R. 1635; M. & O. v. Jobe, 122 Miss. 696, 84 South. 910.

In line with the federal decisions, the question here presented was embraced (Hines v. Wimbish, 204 Ala. 350, 351, 85 South. 765, 766) in the observation of Mr. Justice McClellan that—

"The right of damnified parties to sue for injuries of the class this plaintiff suffered and the methods to be observed in so doing were preserved by the federal authority assuming custody and control of railways (see full statement of statutes, presidential proclamations and rules and orders, in Vaughn v. State, 81 South. 417 et seq.); and it appears from these concluding sources that actions like this should be instituted against the official, the Director General of Railroads of the United States."

By analogy, this view was supported in Dooley v. Pennsylvania R. Co. (D. C.) 250 Fed. 142, where it is stated:

"The ground relied upon at the argument of the motion to quash was that, by virtue of the provision in the proclamation of the President of the United States, dated December 26, 1917, the traffic balances aforesaid were not garnishable. The provision in said proclamation referred to is as follows: 'Except with the prior written assent of said Director, no attachment by mesne process or on execution shall be levied on or against any of the property used by any of said transportation systems in the conduct of their business as common carriers; but suits may be brought by and against said carriers and judgments entered as hitherto until and except so far as said Director may by general or special order, otherwise determine.' It is admitted that no written consent of the Director mentioned in said above-quoted clause had been obtained granting the levy of the garnishment. It is claimed, however, by the plaintiff: First, that this particular clause of the proclamation is without warrant of law; second, that traffic balances are not included within the terms of said clause—in other words, that such traffic balances are not 'property used by any of said transportation systems in the conduct of their business as common carriers.' "

The holding was that such funds were governmental properties as proceeds of the operation of transportation properties in question operated under federal control, and that except with the prior and written consent of the Director General, no attachment by mesne process or on execution shall be levied on or against the property used by any of said transportation systems in the conduct of their business as common carriers; for warrant is found for said provision of the proclamation in what is implied in the statute, which is as much a part of it as what is expressed (County of Wilson v. National Bank, 103 U. S. 770, 26 L. Ed. 488; City of Little Rock v. U. S., 103 Fed. 418, 43 C. C. A. 261); and that a power conferred, that which is necessary to make it effectual, will be implied; that governmental control of railroads to be effective should be exclusive, and not subject to interferences by private parties; and that the clause in the President's proclamation preventing mesne or final process was fully authorized by law.

In L. & N. R. R. Co. v. Johnson, 204 Ala. 150, 85 South. 372, the motion to substitute as a party defendant the Director General was denied to the defendant, and affirmative charges requested by defendant in writing refused. The instant question was disposed of by the observation that—

"The suit is properly brought against the defendant company under the authority of the act of Congress of March 21, 1918."

That suit was brought against Louisville & Nashville Railroad Company on February 19, 1918, for personal injury inflicted on February 17, 1918, by an approaching train on the track of that corporation in Cullman county, and demurrer to the complaint, of date March 20, 1918, made no suggestion as to proper parties defendant. On December 28, 1918, notice issued to plaintiff of the hearing of defendant's motion (January 6, 1919), to substitute the Director General of Railroads as a party defendant for and in the place of the Louisville & Nashville Railroad Company, and to dismiss said cause as against 'said company, pursuant to "General Order No. 50, dated October 28, 1918, of W. G. McAdoo, Director General of Railroads." The motion bearing date of February 12, 1919, was overruled on that date. The decision in the Johnson Case, supra, would appear to be contrary to the announcement contained in Hines v. Wimbish. Though concurring therein, after a more extended investigation of the question, the writer is of opinion that the rule of the Wimbish Case is correct.

The act of Congress (March 21, 1918) expressly declares that property, earnings, or income from transportation systems operated by the government "during federal control" are the "property of the United States" (section 12); suspends the "lawful police regulations of the several states," as the same "may affect the transportation of troops, war materials, government supplies, or the issue of stocks and bonds" (section 15); and declares all the provisions of the act to be emergency legislation, enacted to meet the conditions growing out of the war. If transportation properties under government control, or the earnings or proceeds thereof, may not be seized or condemned by attachment or garnishment on principles of public policy, like reason, within the express or implied power of the acts of Congress, would prevent judgments, executions and seizures thereunder without notice or opportunity to defend on the part of the government for its act of operation. That this was the scope of the act of Congress is further emphasized by the provision that "no process, mesne or final, shall be levied against any property under such federal control" (Act approved March 21, 1918, § 10), without regard to the date of institution of such proceedings or rendition of judgment or decree. If the provisions of the orders of the Director General of Railroads for his substitution (on application) as a party defendant in pending suits based on causes of action arising during federal control for which the corporation was not responsible are beyond the express and implied powers of the act of March 21, 1918, so also must be the provisions in the President's proclamation providing against the levy of attachments by mesne process or on execution, or against any of the property used by any of said transportation systems without the prior written assent of said Director General, without the purview of the act of Congress of August 29, 1916. We therefore cannot agree that the President or Director General were guilty of usurpation of the power of Congress. The meeting of the great emergency was provided for by Congress. In the issue of these proclamations and orders, the President and his Director General were only doing the needful and necessary thing in the protection of the properties and funds of transportation systems under federal control in its utilization to the governmental end provided by the acts of Congress. The provisions of section 10 of the act (of March 21, 1918) merely preserved a right of action against the government for its acts by a convenient name and representative rather than against the corporation, the properties of which had been taken over by the government by operation of law, and which corporation was not responsible for the acts of the government, and preserved a right of action against the corporation for its properties, acts, and liabilities for which the government was not subject by operation of law, and as to its properties not taken over and operated as a part of its transportation system by the government.

That the financial responsibility assumed under the act of Congress by the government by operation of law and evidenced by its contract of operation of railroads and of the Louisville & Nashville Railroads system may be increased by judgments against that corporation in suits in which the Director General was not made a party or is denied by the court the right to intervene in defense of the acts of the government's agents, and become subject to responsibility without representation, as a day in court, was not within contemplation of the law-making body at the time of the enactment of the federal statutes having application. The object of the acts of Congress was to take over the specific properties of transportation systems for the better prosecution of the war; and as to such properties within the field of operation of the several acts, as expressed and implied therein, the authority of the government was supreme and free from interference. Such was the decision in Dooley v. Pennsylvania R. Co., supra.

No doubt it was a fact that there was a field of operation for the corporate function of the directorate of a corporation when its transportation properties were taken and operated by the government, as to its stockholders, and as to its other corporate properties not taken and operated by the government as a part of the transportation system, making necessary the provision of section 10. Having this view and keeping clear the distinction between the corporation and its properties taken by the government and oper-

ated for transportation by operation of law, it appears that Congress deemed it expedient to authorize suits against such corporation in causes of action arising out of the dealings of the corporation with its stockholders and with its properties wholly unconnected with the transportation systems operated by the government and with which the government had no concern as a party, and which was not taken over by operation of law. However this may be, it will not be said that it was the intent of Congress (by section 10) to authorize suits against the corporation, the properties of which were taken over and operated by the government, in causes arising out of the transactions had with the railroad administration and operation, or through torts committed under its administration of said properties in transportation and while under its control and bind the government by judgment to which it was not a party or to deny participation to the government (the real party in interest) as a party in the defense. A construction authorizing procedure against the corporation, the properties of which were being operated by the government, and denying participation in defense of the government's actions by the Director General of Railroads, would render section 10 of the act of March 21, 1918, obnoxious to provisions of the Constitution denying the taking of property without due process of law, "a purpose which may not be imputed to Congress."

The General Order in question of William G. McAdoo, and its reissue by Walker D. Hines, as Directors General of Railroads, were within the powers of that official as the representative of the President under the acts of Congress, and not in contravention of the provisions of section 10, where the carrier, while under federal control, was declared to be subject to all laws and liabilities as common carrier, "whether arising under state or federal laws or at common law, except in so far as may be inconsistent with the provisions of this act, or any other act applicable to such federal control or with any order of the President."

We are of opinion that Walker D. Hines, successor in office to William G. McAdoo, as Director General of Railroads of the United States, was not only a proper, but a necessary, party defendant, and that the affirmative charge was justified on the failure of proof. Any other construction of the act of Congress would have the effect of denying the right of a day in court by the party to be bound by the judgment, or saying that he who has never had an opportunity to be heard is bound by the judgment. Such is not the law of the land. Hale v. Finch, 104 U. S. 261, 26 L. Ed. 732; Litchfield v. Goodnow, 123 U. S. 551, 8 Sup. Ct. 210, 31 L. Ed. 199; Aspden v. Nixon, 4 How. 467, 11 L. Ed. 1059; Harris v. Hardeman, 14 How. 334, 14

L. Ed. 444; Humes v. Scruggs, 94 U. S. 22, 24 L. Ed. 51; Sessions v. Johnson, 95 U. S. 347, 24 L. Ed. 596; Brooklyn City R. Co. v. Nat. Bank, 102 U. S. 14, 26 L. Ed. 61; Johnson v. Powers, 139 U. S. 156, 11 Sup. Ct. 525, 35 L. Ed. 112; Pardee v. Aldridge, 189 U. S. 429, 23 Sup. Ct. 514, 47 L. Ed. 883; Winston v. Westfeldt, 22 Ala. 760, 58 Am. Dec. 278; Wilson v. Campbell, 33 Ala. 249, 70 Am. Dec. 586; Elmore, Quillian & Co. v. Henderson-M. Merc. Co., 179 Ala. 548, 60 South. 820, 43 L. R. A. (N. S.) 950.

The majority of the court do not concur in the foregoing disposition of the case, and are of opinion that the giving of the general affirmative charge at defendant's request in writing cannot be justified for the aforestated reason.

The rule of evidence prevailing in this state (Tobler v. Pioneer Min. & Mfg. Co., 166 Ala. 482, 517, 52 South. 86; Amerson v. Corona Coal & Iron Co., 194 Ala. 175 (69 South. 601) authorizes a submission of the facts to the jury for the inferences to be drawn. If defendant's superior official, in authority over plaintiff's intestate and Parrish in the discharge of their duties of employment by defendant at Minooka, knew or had notice that, of the operators on duty at such point (Parrish, Crim, and Kemp), Parrish was not in his right mind, and had recently exhibited dangerous or violent tendencies of conduct, and, notwithstanding this notice or knowledge, kept Parrish on duty with Crim, instructed or required the latter "to keep an eye on him" and to make report to such superior official of his condition or conduct; and if, in the discharge of this duty of looking after Parrish, Crim was killed by Parrish, on this phase of the case a jury question was presented. The testimony of Mr. Massey and Mrs. Crim tended to show such fact, and notice or knowledge of Parrish's condition or said conduct, on the part of the trainmaster or official in authority over Crim and Parrish. Plaintiff's evidence tended further to show that, recognizing his failing physical and mental condition, Parrish had recently theretofore informed his superior in defendant's office, to whom he was subject and required to report, that he was sick, and asked to be relieved, which request was met with the inquiry, "What is the matter, Parrish?" and answered, "I don't know; I am sick; I want you to relieve me; * * * good-bye." This request from Parrish to be relieved from duty was made after the knowledge of said Parrish's failing health and mental condition was known to defendant's official in authority, or such was an inference that may be drawn that it was before Crim was instructed "to keep an eye on him" and report his condition. Be this as it may, with knowledge of his failing mental condition, he was kept employed with Crim, who was re-

quired to look after him, and in so doing was killed by Parrish.

On the phase of the case presupposing knowledge on the part of defendant's superior official of Parrish's illness or mental malady, and that it had been manifested in a suicidal tendency, was Crim in the discharge of the duties of his employment at the time he was killed by Parrish? That is to inquire was he acting in compliance with the order of his superior to look after Parrish and report his conduct to such superior official of defendant? As to this, there was evidence, or inference to be drawn therefrom, warranting the submission of this question of fact to the jury. It will be remembered that the witness Massey testified that assistant trainmaster Kirkley had told him about 30 days before Crim was killed that Parrish had been crazy two or three months; that since Parrish had "tried to commit suicide down there, he had not been in his right mind"; and that "Parrish had been ordered relieved, and he (Kirkley) didn't know why they had not relieved him." Mrs. Crim testified that she heard a conversation between said trainmaster Kirkley and her husband in the station at Minooka, with reference to Parrish's illness or condition, and in which connection that official had said of Parrish that his mind was deranged, or was not of sound mind, and instructed Crim to keep an eye on him (Parrish) and report the condition to him; that Crim received his orders from Kirkley when he was a train dispatcher, and that at the time of the conversation Kirkley was higher in authority as an official of the defendant than her husband, plaintiff's intestate.

The evidence tended to show (of the facts of the homicide) that defendant's office at Minooka Station, where the telegraph operators performed their duties, was several feet from the main line track; that a house composed of dismantled box cars, situated on the right of way near the track north of said office and near thereto, was occupied by Parrish and his wife; that it was about 100 feet removed from the office; that immediately preceding the homicide Crim and one Bailey were in the office where the former was in the discharge of his duties, when Mrs. Parrish came therein and told Crim that something was wrong at the house, and requested that he go out there; that Crim "got up from his work to go," and "went straight up to" or toward Parrish's house, and was shot after he got inside of the wire fence or yard surrounding this box car house occupied by Parrish. The evidence tended to show that Parrish killed plaintiff's intestate. In this connection we may note of the premises as described by the train dispatcher of that division (Antwine), as follows:

"* * * The house that Mr. Parrish * * * lived in [was] a box car, * * * located on the side of the track. The operators' office at Minooka is within 40 or 50 feet [of this house occupied by Parrish]. Those buildings were made of * * * Louisville & Nashville Railroad Company box cars," and enclosed by "a yard fence, * * * a kind of wire fence. * * * Both of them [the office and Parrish's house] are in the Louisville & Nashville Railroad Company's right of way, * * * about 40 or 50 feet apart. * * * Mr. Parrish lived there, and worked right at the office, 40 or 50 feet away."

The general affirmative charge for the defendant should be given only where there is no evidence tending to establish plaintiff's case, where the court may direct a verdict for defendant. McMillan v. Aiken, 88 South. 135;[1] B. & A. Ry. Co. v. Campbell, 203 Ala. 296, 82 South. 546; Birmingham So. R. Co. v. Harrison, 203 Ala. 284, 82 South. 534; Western Ry. of Ala. v. Mays, 197 Ala. 367, 72 South. 641; L. & N. R. R. Co. v. Jenkins, 196 Ala. 136, 72 South. 68; Crandell-Pettee Co. v. Jebeles & Colias Conf. Co., 195 Ala. 152, 69 South. 964; Amerson v. Corona C. & I. Co., supra; Morrison v. Clark, 196 Ala. 670, 72 South. 305; Tobler v. Pioneer Min. & Mfg. Co., supra, 166 Ala. 517, 52 South. 86. That is to say, if there is evidence reasonably affording an inference adverse to the right of recovery by the party asking the general charge (Bowen v. Hamilton, 197 Ala. 418, 73 South. 5; N. C. & St. L. Ry. v. Crosby, 194 Ala. 338, 70 South. 7; B. R., L. & P. Co. v. Enslen, 144 Ala. 343, 350, 39 South. 74), or from which the jury might draw an inference adverse to such party, the general charge should not be given (Ringeman v. Wiggs Bros., 146 Ala. 685, 40 South. 323; Amerson v. Corona C. & I. Co., supra). The jury may draw such inferences from the facts proved as they believe reasonable (Jones v. Bell, 201 Ala. 336, 77 South. 998; N. C. & St. L. Ry. v. Crosby, supra; Amerson v. Corona C. & I. Co., supra; M., J. & K. C. R. Co. v. Bromberg, 141 Ala. 258, 284, 37 South. 395; B. R., L. & P. Co. v. Enslen, supra; McCormack Harvesting Mch. Co. v. Lowe, 151 Ala. 313, 44 South. 47; W. U. T. Co. v. Brazier, 10 Ala. App. 308, 65 South. 95), and in determining the propriety of the general charge the evidence offered by the party against whom it is given must be accepted as true (McGowin Lbr. & Exp. Co. v. McDonald, 186 Ala. 580, 586, 587, 64 South. 787; Hines, as Director General v. Cooper, 205 Ala. 70, 88 South. 133).

The writer is of the opinion (1) that the giving of the general affirmative charge requested by defendant in writing is to be justified only on the ground that the evidence was insufficient to show a right of action against the Louisville & Nashville Railroad Company, a corporation, the sole defendant,

[1] 205 Ala. 35.

the transportation properties of which corporation were being controlled by the government, by operation of law, at the time of the injury and death of plaintiff's intestate, and (2) that (otherwise) the giving of the affirmative charge for defendant cannot be justified because the evidence introduced at the trial was insufficient to make a jury question under count 8. Roebuck v. Atchison, T. & S. F. Ry. Co., 99 Kan. 544, 162 Pac. 1153, L. R. A. 1917E, 741. In this last conclusion Mr. Justice BROWN concurs.

The conclusion of the majority is announced by Mr. Chief Justice ANDERSON in his subjoined opinion.

Affirmed.

ANDERSON, C. J. (for the majority). We concur in the conclusion of THOMAS, J. in the affirmance of this case, but not in the treatment of same in his opinion, that is, as to improper parties. In the first place, it may be debatable as to whether or not this appellee can suggest this point on this appeal, as it won the case in the court below, and did not take a cross-appeal or assign error as to the trial court's action in not substituting the other defendant, but this right may be conceded, and we still think that this appellee was not entitled to the general affirmative charge because not suable upon this cause of action.

[1] The federal statute, in taking over and assuming control of the railroads as a war measure, expressly authorizes this suit against the Louisville & Nashville Railroad Company and it is doubtful if an order subsequently made by the Director General of Railroads can annul or suspend the act of Congress so as to deprive a plaintiff of the right to sue thereunder. At any rate, this was a pending suit at the time the order in question was promulgated, and said order merely gives the plaintiff the option of amending the pleading so as to make the Director General of Railroads the party defendant. The order was not mandatory in this case, and the suit was tried without error against the railroad company as defendant. L. & N. R. R. Co. v. Johnson, 204 Ala. 150, 85 South. 372.

[2] We, of course, realize that where a suit is brought or amended against the Director General, pursuant to his order, and is defended by the government or by him for the government without objection or invocation of the federal statute, the judgments rendered in such cases should not be disturbed. Hence the ruling in the case of L. & N. R. R. Co. v. Johnson, supra, is reconcilable with the case of Hines v. Wimbish, 204 Ala. 350, 85 South. 765. In the former, the plaintiff sued the railroad company as authorized by the said federal statute. In the latter, the plaintiff sued the Director General in compliance with his order, and it was defended without questioning the plaintiff's right to maintain the suit against him in his representative capacity. A point was made in the Hines Case, supra, that the suit was against Hines individually, and not as Director General, but it was not there insisted or contended that the suit could not be maintained against the Director General. The taking over the railroads being a war measure, and as the roads have now been restored to the owners thereof, the question here involved cannot well arise again, except for injuries arising when the roads were under government control, but it is sufficient to say that judgments obtained against the railroad company will not, for that reason, be disturbed because the federal statute authorizes same. Those procured against the Director General will not be disturbed when it appears that the suit was brought pursuant to his order and the right to be sued was not questioned by him.

[3] We think, however, that this case must be affirmed upon the merits. The only insistence made in brief of counsel for appellant for reversal of this case is that count 8 of his complaint was proven, that is, that the evidence was such as to have required submission of same to the jury. Whether count 8 would be good as against an appropriate demurrer we do not determine, but we concede that if there was enough proof to support the material averments of same, whether slight or great, the case should have been submitted to the jury. It is rather difficult to determine the exact nature or character of count 8, that is, whether it proceeds under the federal Employers' Act (U. S. Comp. St. §§ 8657–8665) or is based upon the common law for the maintenance of a dangerous agency by the defendant upon its premises, and for the natural results of which it would be answerable. Should it be treated as under the federal statute, the proof fails to show that either deceased or the crazy man were at the time of the homicide actually engaged in interstate commerce. Upon the other theory, we do not think that the evidence shows any knowledge on the part of the defendant that this unfortunate homicide would naturally or probably result from permitting Parrish to remain upon its premises. While there was proof of knowledge by the defendant's servants or agents as to his mental derangement, there is nothing to show that his mania was of a dangerous or homicidal character. Arlington Hotel Co. v. Tanner, 111 Ark. 337, 164 S. W. 286.

McCLELLAN, SAYRE, SOMERVILLE, and GARDNER, JJ., concur in this opinion and the result.

BROWN, J., concurs in the first proposition, but dissents as to the result upon the merits, and thinks there was sufficient evidence in

support of the complaint to take the case to the jury, and that the case should therefore be reversed.

THOMAS, J., concurs in the result for reasons given in his individual opinion.